UNITED STATES DISTRICT COURT

Northern District of California

| | |
|---|---|
| STEVEN FISHER and SANDRA FISHER | |
| Plaintiffs, | No. C-01-21192 PVT |
| v. | **ORDER GRANTING PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW RE: WARRANTLESS ARREST** |
| CITY OF SAN JOSE, CITY OF SAN JOSE POLICE DEPT, et al., | |
| Defendants. | |

This matter comes before the court on Plaintiff, Steven Fisher's, Renewed Motion for Judgment as a Matter of Law under Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"). Specifically, Plaintiff brings this motion to set aside a jury verdict in favor of Defendants on the issue of the warrantless arrest of Plaintiff in his home. Plaintiff contends that this verdict is not supported by the law or the testimony elicited during trial, and that no reasonable jury could have found for Defendants on this issue.

This action involves a lawsuit by husband and wife, Steven and Sandra Fisher, against the City of San Jose, the City of San Jose Police Department, and numerous San Jose police officers (the "officer Defendants") (collectively, "Defendants") involved in the arrest of Steven Fisher. The complaint alleged that the Defendants violated Plaintiffs' Fourth Amendment rights and committed a number of state law violations when they arrested Plaintiff Steven Fisher in his home without a warrant and shot him in the leg with a rubber bullet from a "less-than-lethal" Sage gun.

This case was tried before a jury and, after an eight-day trial, the jury returned a

1  verdict in favor of the Defendants on all claims.  Judgment was entered in favor of
2  Defendants on November 24, 2003.  Prior to the case being submitted to the jury, Plaintiff
3  brought a Motion for Judgment As a Matter of Law under Rule 50(a) on the issue of his
4  warrantless arrest.  The court denied the motion and Plaintiff now brings this Renewed
5  Motion for Judgment As a Matter of Law under Rule 50(b).  Having considered the parties'
6  arguments and submissions, and for the reasons set forth below, the court hereby enters the
7  following memorandum and order.

*BACKGROUND[1]*

On October 23, 1999, at approximately 3:00 p.m., Plaintiffs Steven and Sandra Fisher were in their apartment in San Jose, where Mr. Fisher was watching a baseball game and drinking beer.  That afternoon, Fisher watched the entire baseball game and did a few things around the house.  He did not leave the apartment.  At approximately 10:00 or 11:00 p.m., Mr. Fisher started working on a rifle that he owned, disassembling it and cleaning it in an attempt to fix a problem with the bolt.  He was in the living room of his San Jose apartment, sitting on the couch and using the coffee table to work on his rifle.  Subsequently, at around midnight, Mr. Fisher noticed a security guard, Leo Serrano, standing outside his apartment window, motioning to get Mr. Fisher's attention.  In response, Mr. Fisher got up from the couch and went out onto his patio.   He was holding his rifle as he went out to speak to the security guard.  Once Fisher was on the patio, he and the security guard had a conversation about the tenant in the apartment upstairs.  The security guard asked Mr. Fisher if the noise level of the tenant in the apartment above Mr. Fisher's was bothering him.  Mr. Fisher responded that the noise level of the tenant upstairs was not bothering him.

The security guard persisted in asking questions, which began to annoy Mr. Fisher, who did not wish to discuss the upstairs tenant any further.  Mr. Fisher then changed the subject of the discussion and started talking about his rifle and his Second Amendment right

---

[1] In deciding on a Judgment as a Matter of Law, all facts must be construed in the light most favorable to the non-moving party, which here is Defendants. *See Mockler v. Multnomah County*, 140 F.3d 808, 815 n. 8 (9th Cir. 1998).

2

to bear arms. Up until that point, the security guard had not mentioned Mr. Fisher's rifle and had been only talking about the tenant upstairs. Mr. Fisher then went back into his apartment and continued to work on his rifle.

The security guard advised his supervisor about his discussion with Mr. Fisher. The security company's dispatcher then notified the police, and advised them that there was a situation involving a man with a rifle. San Jose Police Sergeant Ryan was the first to arrive on the scene. When Sgt. Ryan arrived on the scene, he talked with Serrano, the security guard. Serrano told Sgt. Ryan about the incident with Fisher and said that he left the area because he didn't feel safe. Sergeant Ryan stated that Serrano told Ryan that he felt threatened by the manner in which Fisher talked to him and held his rifle.

After Sergeant Ryan arrived, numerous other San Jose police officers were called to and arrived at the Fisher's apartment complex. The trial testimony showed that over the course of the event, which lasted until approximately 2:35 p.m. the following day, over sixty officers from the San Jose police department were present at the Fisher residence.

When the police officers first arrived on the scene, they tried to contact Mr. Fisher inside his apartment. Mr. Fisher testified that he first became aware of the presence of the police by means of a recorded message broadcast over a loudspeaker, advising him to come out with his hands up. Fisher would occasionally go out onto the patio and recite passages from the Second Amendment and from magazine articles about the Second Amendment when Sgt. Ryan was trying to talk to him. Mr. Fisher stated that although the message to come outside was repeated over and over, and although he did not believe the police would go away, he simply continued about his business inside the apartment. He watched television and finished drinking the twelve-pack of beer that he had purchased earlier in the day.[2]

The police officers believed that Mr. Fisher was intoxicated. They continued to try to contact Mr. Fisher and convince him to come outside. Specifically, Sgt. Ryan started

---

[2] Plaintiff Sandra Fisher, Steven Fisher's wife, left the apartment shortly after the police arrived. Sgt. Ryan called the apartment, talked with Mrs. Fisher and asked her to come outside.

3

1  throwing rocks at Fisher's apartment to get Fisher's attention. Officer Jan Males, a trained
2  hostage negotiator, spoke with Mr. Fisher. Males stated that Mr. Fisher told her he had been
3  reading the Second Amendment and that no one was going to take his guns away from him.
4  During the conversation with Officer Males, at about 3:00 a.m., Fisher told her that "a
5  person has the right if there is an intruder that comes into their house they have a right to
6  shoot them." According to the testimony at trial, Mr. Fisher also made statements such as "I
7  have guns and I will use them."

8        Over the course of the evening, while Mr. Fisher was in his apartment, he moved and
9  checked additional rifles that he owned. He was seen walking around with a rifle in his
10 hand and was seen more than once aiming the rifle out of the apartment in the general area
11 where the officers were present.

12       During the evening, the police organized a series of perimeters in an attempt to
13 contain Fisher. By the morning, Mr. Fisher still had not come out of his apartment and was
14 not responding to attempts to contact him. Officers saw him moving around in the apartment.
15 Officers participated in evacuating all the other apartment units in Plaintiffs' building. One
16 occupant, because her front door was near Plaintiffs' residence, was evacuated by cutting a
17 hole in her apartment wall that allowed her to leave through a different apartment.

18       At approximately 5:00 a.m., the MERGE Unit (San Jose's SWAT team) took
19 over the inner perimeter surrounding Plaintiffs' apartment. A sniper with a scoped rifle was
20 stationed in the yard area in front of Plaintiffs' apartment. Defendant Sgt. Larry Esquivel was
21 in charge of the MERGE team. The MERGE Unit tried to contact Mr. Fisher via bullhorn but
22 they received no response. As late as 6:23 a.m., Mr. Fisher was seen with a rifle, apparently
23 loading it. After this time, Mr. Fisher was not seen again until he emerged from his
24 apartment at approximately 2:00 p.m.

25       Various officers testified that tactically, and for safety reasons, they would not try to
26 enter Fisher's apartment. From approximately 8:30 a.m. to 9:30 a.m., numerous calls were
27 placed to the Fisher residence, but received only a busy signal. At 8:48 a.m., the electric
28 power to the Fisher's apartment was cut off. At approximately 9:30 a.m., the MERGE team

tossed a "throw phone" into the apartment in an attempt to contact Mr. Fisher. Over the next 45 minutes, MERGE officers called on the throw phone, but Mr. Fisher did not answer. Then at approximately 10:50 a.m., MERGE officers employed a distraction device known as a "flashbang," which creates a loud noise and bright flash, in order to get Mr. Fisher's attention. Further calls were made on both Plaintiffs' home phone, which still registered a busy signal, and on the throw phone, which Fisher did not answer. MERGE Officers made frequent announcements over a loudspeaker asking Mr. Fisher to answer his home phone and pick up the "throw phone." Mr. Fisher was not seen during this time.

At 1:00 p.m., still having received no response from Mr. Fisher, MERGE officers deployed four canisters of tear gas (CS gas) into the apartment in another effort to cause Mr. Fisher to come outside. MERGE officers also continued to advise Mr. Fisher over a bullhorn to come out of the apartment. At 1:30 p.m., a second round of tear gas was introduced. After that, at about 2:00 p.m., Mr. Fisher came out onto the patio and sat in a chair. He continued to fail to respond to requests, over a bullhorn, to communicate with the officers. Finally, Mr. Fisher picked up the "throw phone" and talked with a police negotiator.

After this conversation, Mr. Fisher agreed to come outside. At approximately 2:35 p.m., Fisher exited the apartment, failed to comply with the orders of the police department's React Team, and was taken into custody after being shot once with a round from a less-than-lethal firearm.

*LEGAL STANDARD -- JUDGMENT AS A MATTER OF LAW*

Rule 50(b), which provides for renewing a judgment as a matter of law, states:
 If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.... In ruling on a renewed motion, the court may: (1) if a verdict was returned: (A) allow the judgment to stand, (B) order a new trial, or (C) direct entry of judgment as a matter of law. Fed. R. Civ. P. 50(b).

5

Motions for judgment as a matter of law in jury trials are governed under the same standard as summary judgment motions, albeit at a later stage of the proceeding. *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 772 (9th Cir. 1981). Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the non-moving party, allows only one reasonable conclusion, and that conclusion is contrary to that reached by the jury. *Mockler v. Multnomah County*, 140 F.3d 808, 815 n. 8 (9th Cir. 1998) (internal quotations omitted). In other words, judgment as a matter of law may be granted "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue ...." Fed. R. Civ. P. 50(a)(1); *Juhnke v. EIG Corp.*, 444 F.2d 1323, 1325 (9th Cir. 1971) (citations omitted).

The jury's verdict must be affirmed if it is supported by substantial evidence. "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir.1999) (internal quotations and citations omitted). The Court must determine whether there is relevant evidence sufficient to permit reasonable minds to reach the jury's verdict. *See Landes Constr. v. Royal Bank of Canada*, 833 F.2d at 1371 (citing *St. Elizabeth Community Hospital v. Heckler*, 745 F.2d 587, 592 (9th Cir.1984)). In considering a motion under Rule 50(b) "the district court is not free to weigh the parties' evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury." 9A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE: CIVIL 2d § 2524, 255-56 (1995) (internal citations omitted); *see Baker v. Delta Airlines*, 6 F.3d 632, 644 (9th Cir. 1993).

*DISCUSSION*

I.   *Warrantless Arrest -- Legal Standards*

The Fourth Amendment precludes indiscriminate searches and seizures absent a

6

warrant. A warrant may not issue without probable cause.[3] This protection is particularly pronounced within the boundaries of a person's home. Indeed, "the right of a man to retreat into his home and there be free from unreasonable governmental intrusion" stands "[a]t the very core of the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 589-90, 100 S. Ct. 1371 (1980) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961); *Dorman v. United States*, 435 F.2d 385, 389 (D.C. Cir. 1970) ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment").

The Supreme Court has recognized the sanctity of the home, emphasizing that "exceptions to the warrant requirement are 'few in number and carefully delineated.'" *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S. Ct. 2091 (1984) (quoting *United States Dist. Court*, 407 U.S. at 318). Such arrests may not be made absent probable cause *and* exigent circumstances. *Payton*, 445 U.S. at 588-89; *LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000) ("[I]t is well settled constitutional law that, absent exigent circumstances, probable cause alone cannot justify an officer's warrantless entry into a person's home.").

Furthermore, whether a person is placed under arrest depends upon all the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree and type of force of authority used to effectuate the arrest. *See, e.g., United States v. Patterson*, 648 F.2d 625, 632 (9th Cir. 1981). The question is whether, under all the circumstances, a reasonable person would conclude that he was under arrest. *Id.* More specifically, with regard to an arrest in the home, "in these circumstances, it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs." *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980), *aff'd on other grounds*, 457 U.S. 537 (1982). Where a suspect's home is surrounded by officers with their weapons

---

[3] The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probably cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

drawn, his freedom of movement is totally restricted, and he emerges from the house *only* because of extreme police coercion, this is constructive entry and is considered an arrest within the home. *See United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1986); *see also*, *Johnson*, 626 F.2d at 757.

Exigent circumstances supporting a warrantless arrest should seldom be found. *LaLonde*, 204 F.3d at 956 ("Supreme Court and Ninth Circuit cases have strictly limited the exigency exception, especially in the context of warrantless arrests in the home."). Such circumstances are narrowly construed and limited to emergency situations demanding an immediate response to prevent serious injury to the arresting officers or other persons. *Id.*; *United States v. Echegoyen*, 799 F.2d 1271, 1278 (9th Cir. 1986). The likelihood of this threat is greater if it appears that the suspect is armed, *see Minnesota v. Olsen*, 495 U.S. 91, 100, 110 S. Ct. 1684 (1990). "The presence of a firearm alone is *not* an exigent circumstance," however. *United States v. Gooch*, 6 F.3d 673, 680 (9th Cir. 1993); *LaLonde*, 204 F.3d 947 (declining to find exigent circumstances notwithstanding suspect's ownership of a weapon). "[A]n important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *See Welsh*, 466 U.S. at 753. Exigent circumstances may also exist if a delay would cause the destruction of evidence, the escape of the suspect, or otherwise impair the law enforcement process. *Salvador*, 740 F.2d at 758.

The existence of exigent circumstances is to be determined by the court, rather than the arresting officer. *Johnson v. United States*, 333 U.S. 10, 13-14, 68 S. Ct. 367 (1948). This determination must be made after a consideration of the "totality of the circumstances known to the officers at the time of the warrantless intrusion." *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985).

Finally, Ninth Circuit precedent is clear that time is a factor in looking at the government's ability to obtain a warrant. In *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986), for example, the court explicitly stated that "[e]xigent circumstances alone, however, are insufficient as the government must also show that a warrant could not have

been obtained in time." Similarly, in *United States v. Alvarez*, 810 F.2d 879, 882 (9th Cir. 1987), where a period of between ninety minutes and two hours elapsed after probable cause and exigent circumstances arose, the court concluded that the passage of this time and the apparent lack of any good faith attempt to even try to secure a warrant, vitiated any exigent circumstance exception to the warrant requirement under the Fourth Amendment. Specifically, the court stated:

> In cases where exigent circumstances truly exist, we recognize that the usual Fourth Amendment protection must give way. But because of the danger that exceptions pose for Fourth Amendment guarantees, we are most unwilling to excuse the government's failure to seek a warrant in cases where no necessity for "immediate action" can be demonstrated.
>
> We are even less willing to ratify the government's action where, as here, there has been not the slightest effort to comply with a clear, concise rule such as Rule 41(c)(2). Rule 41(c)(2) was designed to accommodate the needs of law enforcement while ensuring the preservation of constitutional rights . . . The action of the agents and the Assistant United States Attorney in ignoring telephone warrant procedure totally frustrates the accommodation approved by Congress. It cannot be sanctioned by us.

*Alvarez*, 810 F.2d at 884. In short, the law "simply requires the government either to attempt, in good faith, to secure a warrant or to present evidence explaining why a telephone warrant was unavailable or impractical." *Id.* at 883.

## II. *Warrantless Arrest of Plaintiff Steven Fisher*

Plaintiff contends that the jury's verdict in favor of Defendants on the issue of Plaintiff's warrantless arrest in his home is supported by neither the law nor the facts elicited at trial, and that no reasonable jury could have found for Defendants on this issue.

### A. <u>Arrest</u>

As applied here to Fisher, taking all facts in the light most favorable to the jury's verdict and, thus, in favor of Defendants, it is undisputed under the clear Ninth Circuit precedent of *Al-Azzawy* and *Johnson* discussed above, that Steven Fisher was placed under arrest in his home during the interactions with the San Jose police. The testimony at trial was clear that officers of the San Jose police department set up a perimeter around the

Fisher's home in order to contain Mr. Fisher, ordered Fisher to emerge over a loud bullhorn, threw rocks and shot canisters of tear gas into Fisher's home, and used other tactics clearly designed to make Fisher exit his apartment. The testimony at trial from Fisher, the officer Defendants and other witnesses leaves little doubt that Fisher emerged from his home *only* because of this police coercion and a reasonable jury only could conclude that Fisher was under arrest during this encounter with the San Jose police.

As explained in *Johnson*, constructive entry of this type must be considered an arrest within the meaning of the Fourth Amendment otherwise "arresting officers could avoid illegal 'entry' into a home simply by remaining outside the doorway and controlling the movements of suspects within through the use of weapons that greatly extend the 'reach' of the arresting officers." 626 F.2d at 757. Accordingly, because under the facts presented at trial with all disputed facts resolved in favor of the jury's verdict, Plaintiff was put under arrest in his home, Defendants were obligated to secure a warrant legally to effectuate such an arrest, *unless* exigent circumstances were present.

B.     *Exigent Circumstances*

As explained above, exigent circumstances supporting a warrantless arrest should seldom be found, *LaLonde*, 204 F.3d at 956. Such circumstances are narrowly construed and limited to emergency situations demanding an immediate response to prevent serious injury to the arresting officers or other persons. *Id.*; *United States v. Echegoyen*, 799 F.2d 1271, 1278 (9th Cir. 1986). Moreover, and most pertinent here, time is a factor. *Good*, 780 F.2d at 775. The government must, in good faith, attempt to obtain a warrant unless it can show that one was unavailable or impractical. *Alvarez*, 810 F.2d at 883.

Again, resolving all disputed facts in support of the jury's verdict, the court concludes that the testimony presented at trial did not support the jury's verdict that a warrantless arrest of Plaintiff Steven Fisher was lawful. The very circumstances under which Steven Fisher were arrested negate any implication that there was any great exigency in arresting him without securing a warrant. The interactions between the San Jose Police and Fisher lasted for over twelve hours, after which Fisher emerged from his home. As he

10

1 must to support the jury's verdict, Plaintiff concedes that between the time the officers
2 arrived until 6:30 a.m., there was probable cause *and* exigent circumstances. It was during
3 this time that Fisher exhibited aggressive behavior, including aiming a rifle in the direction
4 of the officers.

However, between 6:30 a.m. and the time Fisher was taken into custody at 2:35 p.m., no exigency existed. Indeed, the testimony at trial was that Mr. Fisher was not even seen during this time. Defendants, therefore, had ample opportunity and time to seek a warrant from a neutral and detached "magistrate," as they were required to do under the law.[4] *Alvarez*, 810 F.2d at 883 (holding that "the government must, in good faith, attempt to obtain a warrant unless it can show that one was unavailable or impractical"). There simply are no facts to suggest that Fisher was going to destroy evidence such that a delay in seeking a warrant would perhaps be justified, or that Fisher was going to escape, or that there was any immediate danger to any officer or anyone else such that *one* of the members of the force could not leave the scene or use the telephone to seek a warrant during this approximately eight-hour period when Fisher failed to show any aggressive behavior (or to show himself at all).

Indeed, from the testimony elicited at trial, there were well over sixty officers present at the Fisher's apartment complex. Defendants have offered no explanation, and none exists, as to why *one* of these officers was unable to seek and obtain a telephone warrant or make use of the procedures available twenty-four hours a day to obtain a warrant from a judge in person, or at least make some good faith attempt to do so. Several officers on the scene testified during trial that they were aware that a procedure existed by which they were able to seek and obtain a warrant by telephone but stated that they did not do so because they

---

[4] Though it is not part of the court's holding, the court notes that even during the early morning hours, when plaintiff concedes that there existed probable cause and exigent circumstances, given the lengthy time period of over five hours *and* the large number of officers on the scene, it was possible even during this time for *one* officer to seek and obtain a warrant without endangering the lives of officers or anyone else.

11

1 did not believe one was required. The officers were incorrect.[5] Under cases such as

2 *Alvarez*, 810 F.2d at 882, where much less time elapsed (there, at most two hours) and

3 where less officers were present on the scene, the court nevertheless concluded that exigent

4 circumstances were *not* present and that the government had time to comply with the

5 procedures for obtaining a telephone warrant. This may very well have been a different case

6 had there been two officers on the scene instead of sixty-plus. But under the facts as they

7 existed here, there is no explanation consistent with current case law as to why not a single

8 officer was instructed to seek a warrant.

9 Defendants ask the court to support a theory of a "continuing exigency." That is,

10 Defendants contend that, despite the fact that Mr. Fisher was not seen (let alone seen with a

11 weapon) for eight hours between approximately 6:30 a.m. and the time he was taken into

12 custody later that afternoon at 2:35 p.m., that the exigency continued from hours earlier when

13 Fisher was exhibiting aggressive behavior. This is not the law, and Defendants have cited

14 no case to support this theory. The exigent circumstances exception is just that -- an

15 exception. The general rule, as set forth in detail above, is that the police *must* seek a

16 warrant to arrest a suspect in his home. The presumption under the Fourth Amendment is that

17 an arrest in a home without a warrant is unreasonable, and the government must demonstrate

18 exigent circumstances to overcome this presumption. *See Payton*, 445 U.S. at 589-90. The

19 officers here testified that they did not believe a warrant was necessary. A warrant is

20 *always* necessary, however, to arrest a suspect in his home *unless* exigent circumstances are

21 present, and the officers should have been trained as such. Officers should be trained that the

22 default position under the Fourth Amendment is always to seek a warrant -- not the

23 alternative -- that a warrant *might* be necessary in certain circumstances.

24 Based upon the testimony presented at trial, there were no exigent circumstances

25 present from 6:30 a.m. until Mr. Fisher was taken into custody eight hours later. No

---

[5] Indeed, the testimony at trial showed that the only person who mentioned the need for a warrant was Steven Fisher.

1  reasonable jury could have found otherwise.  The court, therefore, concludes that Defendant

2  the City of San Jose[6] violated Plaintiff Steven Fisher's rights under the Fourth Amendment

3  when it arrested him in his home without a warrant or any good faith attempt to secure one.

### *CONCLUSION*

For the foregoing reasons, the court hereby GRANTS Plaintiff's Renewed Motion for Judgment As a Matter of Law under Rule 50(b).

Accordingly, the Judgment entered in favor of Defendants on November 24, 2003 is hereby modified.  Judgment on the issue of warrantless arrest shall be entered in favor of Plaintiff and against Defendant, the City of San Jose.  The court awards nominal damages to Plaintiff in the amount of one-dollar on this claim.  The court also orders that from the date this order is filed forward, all officers in the San Jose Police Department shall receive training, either as part of a practical course or in the form of a training manual, on what is required under the Fourth Amendment and the case law interpreting it lawfully to arrest a suspect in his or her home and on the procedures for obtaining warrants both in-person and on the telephone.

---

[6] Judgment is against the city and not individual officers, because the City admitted in its response to Request for Admission number 34 that the procedures were done pursuant to policies and procedures of the police department, and there is no single officer responsible for the warrantless arrest. Local governments are "persons" subject to liability under section 1983 where official policy or custom causes a constitutional tort. *See Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The parties shall apportion costs and attorneys' fees accordingly.

IT IS SO ORDERED.

Dated: *4/16/04*

>*/s/ Patricia V. Trumbull*
>PATRICIA V. TRUMBULL
>United States Magistrate Judge