**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STEVEN FISHER,
            *Plaintiff-Appellee,*

and

SANDRA FISHER,
                        *Plaintiff,*

v.

CITY OF SAN JOSE,
            *Defendant-Appellant,*

and

CITY OF SAN JOSE POLICE
DEPARTMENT; OFFICER BOLER;
OFFICER BARNETT; OFFICER CORREA;
OFFICER ESQUIVEL; OFFICER HONDA;
OFFICER KINSWORTHY; OFFICER
O'BRIEN; OFFICER RYAN; OFFICER
NGUYEN,
                        *Defendants.*

No. 04-16095

D.C. No.
CV-01-21192-PVT

OPINION

Appeal from the United States District Court
for the Northern District of California
Patricia V. Trumbull, Magistrate Judge, Presiding

Argued and Submitted
June 26, 2008—Pasadena, California

Filed March 11, 2009

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Stephen Reinhardt, Diarmuid F. O'Scannlain,
Pamela Ann Rymer, Sidney R. Thomas, Ronald M. Gould,
Richard A. Paez, Richard C. Tallman, Jay S. Bybee, and
N. Randy Smith, Circuit Judges.

3135

3136          FISHER v. CITY OF SAN JOSE

Opinion by Judge Tallman;
Dissent by Judge Paez;
Dissent by Judge Reinhardt

## COUNSEL

Scott Attaway (argued), Deputy City Attorney, San Jose, California, for the defendants-appellants.

Donald E.J. Kilmer, Jr., San Jose, California, for plaintiff-appellee.

## OPINION

TALLMAN, Circuit Judge:

We address the Fourth Amendment's exigent circumstances doctrine in the context of armed standoffs. Steven Fisher triggered a standoff with San Jose police after he pointed a rifle at a private security guard who was investigating loud noises in Fisher's apartment complex. When the police arrived at his apartment, a noticeably intoxicated Fisher pointed one of his eighteen rifles at the officers and threatened to shoot them. The ensuing standoff lasted more than twelve hours and ended peacefully when Fisher finally emerged and allowed himself to be taken into custody. We hold that Fisher's civil rights were not violated when police arrested him without a warrant.

Fisher and his wife sued under 42 U.S.C. § 1983 naming the City of San Jose, its police department, and several of its officers (collectively, "police"). The suit alleged, among other claims, that police violated Fisher's Fourth Amendment right to be free from unreasonable seizure by arresting him in his home without a warrant. The case went to trial, and the jury found that exigent circumstances excused the need for a warrant.[1] The district court nonetheless granted Fisher's renewed

---

[1] The jury also rejected Fisher's claim that excessive force was employed to effect his arrest and found that no custom or policy of the City of San Jose existed to cover up police handling of armed standoffs by failing to properly investigate alleged misconduct by the officers involved.

motion for judgment as a matter of law, holding that no reasonable jury could have found that there was insufficient time to obtain a warrant. The police appeal.

We consider whether sufficient evidence supports the jury's verdict. We believe so, and in reaching this conclusion, we take the opportunity to clarify our jurisprudence relating to the Fourth Amendment's application to armed standoffs. We hold that, during such a standoff, once exigent circumstances justify the warrantless seizure of the suspect in his home, and so long as the police are actively engaged in completing his arrest, police need not obtain an arrest warrant before taking the suspect into full physical custody. This remains true regardless of whether the exigency that justified the seizure has dissipated by the time the suspect is taken into full physical custody. We therefore reverse the district court and remand with directions to reinstate the jury's verdict and enter judgment in favor of the police.

## I

### A

We recount the evidence in the light most favorable to support the verdict rendered. *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir. 1997).

Fisher began the evening of October 23, 1999, in his apartment, drinking beer, watching the World Series on television, and cleaning his collection of eighteen bolt-action World War I and II era rifles. When the game ended, Fisher continued cleaning his weapons and drinking his way through the two cases of beer he had purchased earlier that day. From time to time, Fisher took a break to read from a book entitled *The Second Amendment Primer.*

Fisher lived on the ground floor of the Tradewinds apartment complex in San Jose, California. The living room of his

ground-floor apartment had two sliding glass doors which opened onto a small patio. The patio, which was surrounded by a low wall, looked out onto a common lawn area. A person standing in the common lawn area could look through the sliding glass doors and into Fisher's living room.

At about 1 a.m., Leonel Serrano, a uniformed security guard employed by Fisher's apartment complex, was patrolling the grounds of the complex when he heard loud music coming from the apartment above Fisher's. Serrano climbed the stairs and knocked on the door. When he heard no answer, he descended and called his supervisor, who apparently notified the police. At some point, Fisher, who was sitting in his living room working on one of his rifles, glimpsed Serrano standing in the common lawn area near Fisher's patio. Fisher approached Serrano carrying a rifle.

Serrano asked Fisher if he knew his upstairs neighbors and whether they were home. Rather than answering Serrano's questions, Fisher asked Serrano why he wanted to know that information, and told Serrano that he should not meddle in other people's affairs.

When Serrano informed Fisher that the police had already been called on account of the noise, Fisher's tone became aggressive. He began ranting about the Second Amendment, and that, in Fisher's view, it guaranteed the right to bear arms and to defend oneself and one's property. Although Serrano was not close enough to smell alcohol on Fisher's breath, Serrano nevertheless believed Fisher to be drunk based on his slurred speech, his decision to embark on an unprovoked exposition on the Second Amendment, and his bizarre and unresponsive answers to Serrano's questions. For example, Fisher first described his upstairs neighbors as nice people, later as vampires, then as nice people again.

As Fisher became more agitated, he shifted the position of the rifle such that it was pointing either at Serrano or in Serra-

no's direction.[2] Serrano, fearing for his safety, quickly left the area in front of Fisher's apartment and reported the confrontation to his supervisor, who placed another call to the police, this time describing a "suspicious person with a weapon." Eight officers were initially dispatched to the Tradewinds apartment complex.

Patrol Sergeant Laurence Ryan, who arrived at 1:50 a.m., was first on the scene. After hearing Serrano describe his encounter with Fisher, Sergeant Ryan assigned the other responding officers to take up positions around Fisher's apartment in order to form a containment perimeter. The officers concealed themselves so as not to become easy targets in the event that Fisher began shooting.

Sergeant Ryan then attempted to get Fisher's attention, first by calling his name, then by throwing small rocks at his sliding glass doors. Fisher eventually emerged onto his patio. Sergeant Ryan explained to Fisher why the police had been called. Fisher, still noticeably intoxicated, lapsed into a rambling, belligerent diatribe about his Second Amendment rights, and threatened to shoot Sergeant Ryan if he came on or near Fisher's property. Fisher also told Sergeant Ryan about the eighteen guns inside his apartment. After about ten minutes of yelling at Sergeant Ryan, Fisher retreated inside.

Fisher's threats, combined with his intoxication, his guns, and his generally irrational behavior prompted Sergeant Ryan to call for additional help. As more officers arrived, they continued to secure the perimeter around Fisher's apartment and to remove his neighbors from any lines of fire. Ultimately,

---

[2]The testimony on this point is somewhat conflicted. According to one San Jose police officer who later participated in the standoff, Serrano informed him that Fisher had pointed his rifle at Serrano. At trial, Serrano testified that when Fisher became more agitated, he shifted the position of the weapon; whereas at the start of the conversation it was pointing at the ground, Fisher pointed it vertically when he became upset and began to gesture with it.

more than sixty San Jose officers were deployed in the stand-off.

Sergeant Ryan attempted to re-establish contact with Fisher by calling his apartment. His wife, Sandra Fisher, answered the phone and agreed to come outside. She told Sergeant Ryan that Fisher now was alone in the apartment, that he had eighteen rifles, and that he was extremely intoxicated.

Officer Derrick Boler was one of the San Jose police officers forming the perimeter around Fisher's house. He was positioned across the street from Fisher's apartment behind a parked car, where he remained for about four and one-half hours as the standoff progressed until he was relieved. At about 2:25 a.m., Officer Boler witnessed Fisher loading cartridges into what he believed to be at least one large caliber rifle, and then Fisher was seen pacing through his apartment holding the loaded weapon. Fisher was also seen loading several other magazines with ammunition, and strategically placing his guns around his apartment. Throughout the standoff, Officer Boler heard Fisher shouting at police, using phrases such as "I have guns. I will use them," and "Leave me the fuck alone. I don't believe in your laws." Officer Boler also witnessed Fisher drinking more beer as the standoff progressed.

Between 3:15 and 3:20 a.m., Officer Jan Males, a tactical negotiator, arrived on the scene and tried unsuccessfully to start a dialogue with Fisher, who continued going on about his right to bear arms and vowing never to relinquish his weapons. At one point, Fisher invited Officer Males into his apartment, but then stated he would shoot or kill her if she entered. Officer Males testified that she believed Fisher's statements to be a criminal threat and a felony offense under the California Penal Code. During these attempts at conversation with Fisher, Officer Boler saw Fisher pointing a gun at Officer Males and Sergeant Ryan, who had taken cover behind a tree. Fisher was last seen holding a rifle at about 6:30 a.m.

At 7:00 a.m., the San Jose Police Department's Mobile Emergency Response Group and Equipment ("MERGE") unit assumed tactical control of the police effort to end the stand-off. Members of the MERGE team replaced most of the patrol officers who had maintained the inner perimeter since the inception of the incident. Some of the departing patrol officers returned to the police station to fill out police incident reports.

Over the next several hours, the MERGE team tried several methods to establish communication with Fisher and resolve the standoff: they used bullhorns and other voice magnifying equipment; they shut off the electrical power; they drove an armored vehicle with its siren activated onto the grass in front of his patio; and they threw a "throw phone"[3] onto the patio. When those techniques failed to induce Fisher to surrender, the MERGE unit detonated a flash-bang device, and, on two occasions, they shot canisters of tear gas into his apartment. Nothing worked to dislodge Fisher from his home.

The standoff entered its final stage at about 2:15 p.m., more than twelve hours after it had begun. Fisher spoke by phone for several minutes with a tactical negotiator, and finally agreed to leave his apartment. He was told to walk toward the officers with his hands above his head, then to lie on the ground. He initially took several steps but suddenly stopped and turned back toward his apartment. At that point, a mem-ber of the MERGE unit shot Fisher in the leg with a non-lethal rubber bullet. Fisher then surrendered and was finally taken into police custody. It was undisputed at trial that no attempt was made at any point during the standoff to obtain an arrest warrant.

Fisher was tried for felony violations of California Penal Code sections 417 and 417.8, which punish, in general, draw-ing, exhibiting, or using a firearm or deadly weapon against

---

[3]A "throw phone" is a phone encased in a box that also contains an open microphone.

a peace officer with the intent to resist or prevent arrest. The criminal jury deadlocked, and Fisher ultimately pleaded no contest to a misdemeanor charge of brandishing a firearm in the presence of a security guard.

### B

Fisher and his wife subsequently filed an action under 42 U.S.C. § 1983 against the City of San Jose, its police department, and many of the officers involved in the standoff. The civil rights complaint alleged, *inter alia*, that police violated Fisher's Fourth Amendment right to be free from unreasonable seizure based on their failure to obtain an arrest warrant before effecting his full physical arrest and on the alleged use of excessive force to effectuate that arrest.

The case was tried to a civil jury. After the presentation of all of the evidence, Fisher moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). His motion was denied, and the jury returned a verdict in favor of the police on all claims. Fisher then renewed his motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). The district court granted the motion as to Fisher's warrantless arrest claim, and denied the motion on the balance of Fisher's claims. The district court ordered the City to pay Fisher one dollar in nominal damages and to train its officers "on what is required under the Fourth Amendment and the case law interpreting it lawfully to arrest a suspect in his or her home and on the procedures for obtaining warrants both in-person and on the telephone."

The police appealed the district court's ruling. On January 16, 2007, a three-judge panel of our court affirmed, with one judge dissenting. *Fisher v. City of San Jose*, 475 F.3d 1049 (9th Cir. 2007). On November 20, 2007, that opinion was withdrawn and replaced by an amended opinion, which again, by a two-to-one margin, affirmed the district court. *Fisher v. City of San Jose*, 509 F.3d 952 (9th Cir. 2007). On March 14,

2008, we ordered the case to be reheard en banc, and vacated the decision of the three-judge panel. We now reverse.

## II

We review *de novo* the district court's decision to grant Fisher's renewed motion for judgment as a matter of law. *See Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1226-27 (9th Cir. 2001). The question we must answer is whether, construing the evidence in the light most favorable to the police, the jury's defense verdict was supported by substantial evidence. *Id.* at 1227. "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1014 (9th Cir. 1985) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In making this determination, we must take care not to substitute our view of the evidence for that of the jury. *Johnson*, 251 F.3d at 1227.

"[W]hen reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury," even if the party did not object to the jury instructions. *Pincay v. Andrews*, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001) (citing *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 181-83 (9th Cir. 1989)).

## III

## A

In order to frame the precise issue before us, we begin by noting several important legal issues about which the parties are in agreement. First, the police concede that even though Fisher was technically taken into custody outside his apartment, he was, for legal purposes, seized inside his home, and, as such, the burden is on the police to show either that they obtained a warrant or that some exception to the warrant

requirement excused officers from getting one. *See United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1986) (holding that the suspect was effectively arrested when police surrounded his trailer "with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees"); *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980), *aff'd*, 457 U.S. 537 (1982). Here, the police assert that exigent circumstances justified Fisher's warrantless seizure.

Second, Fisher concedes that there was probable cause to arrest him. The civil jury was presented with several possible crimes Fisher may have committed, and, by concluding that Fisher's warrantless arrest was justified, the jury necessarily found that a reasonable police officer would have had probable cause to believe Fisher committed at least one of those crimes. *See Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001) ("It is clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances." (citing *Payton v. New York*, 445 U.S. 573, 587-90 (1980))). Ample evidence existed to establish probable cause that Fisher had violated California Penal Code section 417(c) (drawing or exhibiting a loaded or unloaded gun in the presence of a police officer in a rude, angry, or threatening manner) and California Penal Code section 422 (willfully threatening to commit a crime which will result in death or great bodily injury). Officer Boler saw Fisher pointing his gun at Officer Males and Sergeant Ryan. The testimony of several officers establishes that Fisher threatened to shoot Officer Males if she approached his apartment, and his personal arsenal gave Fisher the present ability to make good on those threats. Fisher was obviously intoxicated at the beginning of the standoff and he consumed more alcohol as it progressed. His behavior and irrational statements gave the police further cause for concern that Fisher might be mentally unbalanced and unpredictable.

Third, Fisher concedes that exigent circumstances existed to arrest him before 6:30 a.m., the last time he was seen hold-

ing a gun. Exigent circumstances are defined to include "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir. 1989) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc), *cert. denied*, 469 U.S. 824 (1984)). Before that time, Fisher was seen pointing a rifle at Officer Males and Sergeant Ryan, loading his rifles, and arranging them strategically throughout his apartment to repel any entry the police might have attempted. Fisher does not dispute that up until 6:30 a.m., police could have lawfully entered his apartment, using force if necessary, to complete the arrest.

B

We now turn to the points on which the parties do not agree. According to Fisher, the only reasonable conclusion supported by the evidence is that the exigency that existed before 6:30 a.m. dissipated after that time, thus rendering his continued seizure and the completion of his arrest unreasonable under the Fourth Amendment.[4] Implicit in Fisher's argu-

---

[4] Judge Paez, in dissent, argues that Fisher was not legally seized until about 6:30 a.m. when the MERGE team arrived on the scene, thereby altering the moment at which we should review exigency. Paez Dissent at 3168-70. This innovative view of Fisher's case conflicts with Fisher's own theory on appeal and, in any event, is contradicted by overwhelming evidence, which we construe in the light most favorable to support the jury verdict. Therefore, we reject it.

Without reciting in greater detail the events of the early morning hours of October 24, a reasonable jury could readily conclude that Fisher knew the reasons for and the extent of the police presence. *But see id.* at 3170 (asserting that "there is nothing in the evidence that shows that Fisher was aware of their presence"). He made repeated threats to shoot the officers surrounding his apartment and communicated with a tactical negotiator, Officer Males, before threatening to shoot her, too. Fisher was observed

ment is the following premise: in an armed standoff, once a
suspect is seized by virtue of being surrounded and ordered to
surrender, the passage of time may operate to liberate that
suspect, re-kindle the arrest warrant requirement, and require
police to assess with each passing minute whether the circum-
stances remain exigent.

We reject this premise. Not only does it buckle under the
weight of Supreme Court caselaw and that of our own circuit,
but it further complicates the already complex and dangerous
process of safely resolving armed standoffs, without provid-
ing any meaningful Fourth Amendment protection. We con-
clude that once exigent circumstances and probable cause
justified Fisher's seizure, police were not required to obtain
an arrest warrant despite the fact that they did not take Fisher
into full physical custody until hours later.

1

In *Michigan v. Tyler*, 436 U.S. 499 (1978), a fire chief
arrived at the scene of a suspicious blaze just as firefighters
finished extinguishing it. He entered the gutted building and
tried to determine the cause of the fire. *Id.* at 501-02. After
determining that an arsonist may have started the conflagra-

---

loading his arsenal of weapons with ammunition, strategically placing
rifles around the apartment, and pointing one of them out the window at
officers on the scene. It is also significant that Fisher's wife never returned
to the residence after being coaxed outside by police.

Under these circumstances, a reasonable person would not believe that
his freedom remained unimpaired, especially after engaging in such
aggressive conduct toward the police officers surrounding his apartment.
*See United States v. Washington*, 490 F.3d 765, 769-71 (9th Cir. 2007).
The delusional beliefs of a severely intoxicated Fisher are legally irrele-
vant to determining the point of seizure as a matter of law. An objective
view of the facts compels the conclusion that Fisher was seized much ear-
lier that morning, well before 6:30 a.m. Fisher was as a matter of law
under constructive arrest.

tion, the chief called a police detective to the scene, who arrived one and one-half hours later. *Id.* at 502. The detective searched the building for several minutes but could not complete his search due to lingering smoke and steam. *Id.* The next morning, the fire chief returned to the scene with an assistant fire chief, and, together with the police detective, they scoured the building and collected evidence of the fire's origin. *Id.* There was neither consent nor a warrant for any of these searches or seizures. *Id.*

The Supreme Court upheld the warrantless searches and seizures. The *Tyler* Court rejected as "unrealistically narrow" the Michigan Supreme Court's conclusion that the exigency which justified the initial entry ends "with the dousing of the last flame." *Id.* at 510. The Court reasoned that the return of fire officials and the police detective the following morning was justified because it was "no more than an actual continuation" of the initial entry. *Id.* at 511. In other words, although the return to the crime scene may not, by itself, have satisfied the exigency requirement, the return was justified because it was simply a natural continuation of a legally justified event.

Although *Tyler* did not involve the search of a home, our own caselaw has applied *Tyler* in such a context. In *United States v. Echegoyen*, 799 F.2d 1271 (9th Cir. 1986), police officers responded to a call of a strange smell emanating from a house. One officer determined the smell to be ether, a flammable gas sometimes used to process cocaine. *Id.* at 1274. The officers entered the house without a warrant and arrested several suspects, one of whom was the defendant. *Id.* Moments later, the officers, joined by a firefighter, re-entered the house to eliminate the fire hazard and inspect the residence. *Id.* They discovered cocaine and drug processing equipment. *Id.* The officers and firefighters then left the residence and requested that narcotics agents be sent to the scene to take over the investigation. *Id.* When the agents arrived, they entered the home again, looked around, and left to obtain a warrant. *Id.*

We upheld the legality of all three warrantless entries. As in *Tyler*, the first entries were justified by exigent circumstances. The subsequent entry by narcotics officers after the threat of fire had been diffused and after the house had been cleared of all occupants—akin to the subsequent entry the next day in *Tyler*—was justified as a continuation of the initial lawful entry and exigency. *Id.* at 1280 ("Consequently, this . . . entry was merely a continuation of the initial entry because both were done to alleviate the exigent circumstances.").

[1] Applying *Tyler* and *Echegoyen* to the present case, we conclude that when Fisher was seized at the beginning of the standoff, the officers were not required to periodically reassess whether the exigency persisted throughout the standoff because the standoff was "no more than an actual continuation" of the initial seizure. As in *Echegoyen*, the entirety of the standoff was "done to alleviate the exigent circumstances" that precipitated it. *See Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 565 (6th Cir. 2006) ("Exigent circumstances terminate when the factors creating the exigency are negated.").[5] Moreover, the exigent circumstances that precipitated the initial seizure did not materially change from the beginning of the standoff to the end.

[2] This armed standoff was a single Fourth Amendment event, a continuous process of formalizing Fisher's arrest that

---

[5]Fisher relies principally on *United States v. Alvarez*, 810 F.2d 879 (9th Cir. 1987). There, police effected the warrantless arrest of a suspected drug smuggler in his hotel room after receiving a tip from a co-conspirator. *Id.* at 880. Police later argued that exigent circumstances excused the need for a warrant. *Id.* We disagreed, based on the fact that more than ninety minutes had elapsed between the time the police received the tip and the time they made the arrest. *Id.* at 882-83. In contrast, in the present case, it is undisputed that exigent circumstances existed to seize Fisher. Our task is to decide whether, in an armed standoff, the mere passage of time may act to liberate a lawfully seized suspect, thereby re-triggering the warrant requirement.

began in the early morning hours of October 24. The police maintained a secure perimeter around Fisher's apartment, and Fisher refused to surrender. Fisher threatened the officers shortly after they arrived, and retained full control of his eighteen guns and ammunition until the end. The entire standoff was an uninterrupted, fluid engagement between Fisher and the police. *See id.* (holding that, in an armed standoff, "the exigency did not terminate due to the passage of time because Bing was at all times dangerous" (citing *Tyler*, 436 U.S. at 510)).

[3] The mere fact that Fisher was not seen with a weapon after 6:30 a.m. is not the sort of break in the action that would effectively terminate the first seizure and mark the beginning of a second. Just as a seizure begins when a reasonable person, based on the totality of the circumstances, "would have believed that he was not free to leave," *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *accord Michigan v. Chesternut*, 486 U.S. 567, 573 (1988), a seizure does not end until a reasonable person would feel at liberty to leave. Fisher did not escape from the scene, nor did police withdraw or abandon their efforts to take him into full physical custody. In sum, no event of Fourth Amendment significance occurred that would re-trigger the warrant requirement and compel the police to inquire as to whether exigent circumstances still existed.

2

[4] Fisher's own criminal behavior caused the exigency that excused the Fourth Amendment warrant requirement to which he was otherwise entitled for an in-home arrest. Even Fisher admits that when he pointed his gun at the officers and threatened to shoot them, the police were, at that moment, entitled to enter his home, using force if necessary, to complete his arrest. Fisher offers no support for the proposition that, after officers lawfully seized him in his home, they nevertheless were required to subsequently seek and obtain a warrant

before taking him into full custody. We see no reason to depart from *Tyler* and *Echegoyen* in this case. Quite to the contrary, we find the reasoning especially compelling in connection with armed standoff situations.

a

[5] Requiring police in this type of siege environment to obtain an arrest warrant for Fisher, a person who is already under arrest but not yet in full physical custody, serves no practical purpose. Given that police had ample probable cause to arrest Fisher for felonies committed in their presence, any warrant obtained by the police would have merely authorized them to do exactly what they were already doing, and indeed, exactly what they were already authorized to do: surround Fisher's home and attempt to neutralize the threat that he posed by arresting him.[6] We do not see what a neutral and detached magistrate would have added in helping to peacefully effect Fisher's arrest.

Fisher is unable to clearly define what the Fourth Amendment allegedly required (or should require) the police to ask of the magistrate judge in the instant case. There is no support for the position that, after Fisher had been lawfully seized in his apartment, the Fourth Amendment required the police to retroactively justify the arrest to a magistrate judge by asking for an arrest warrant that had in effect already been executed. In fact, asking the magistrate judge to determine whether probable cause justified the initial seizure when police first surrounded Fisher's residence or justifies his continued seizure amounts to the retroactive warrant practice that we have

---

[6]Under California Penal Code section 836, a police officer may arrest without a warrant a person the officer has probable cause to believe has committed a felony. Cal. Penal Code § 836(a). The only question here is whether a warrant was required to arrest Fisher in his home when Fisher was engaged in ongoing felonies and resisting a lawful arrest by taking up arms and refusing to surrender.

condemned. *See United States v. Allard*, 634 F.2d 1182, 1187 (9th Cir. 1980) (observing that "*post hoc* justifications [for searches and seizures] are alien to the Fourth Amendment warrant and reasonableness requirements").[7]

In addition, Fisher's dissipation theory would have serious consequences beyond simply forcing police to engage in the empty gesture of obtaining a warrant in the midst of a dangerous and volatile standoff. It would introduce yet another element of uncertainty into the already complex and dangerous calculus confronting law enforcement in armed standoff situations. At minimum, the officers on the scene would be unable to devote their full attention to the actual threat and to ensuring public safety. Police would be forced to ponder with each

---

[7]In his dissent, Judge Reinhardt clarifies that, under his theory, the magistrate judge would treat the warrant application in these circumstances no differently than any other warrant application. Reinhardt Dissent at 3185 n.10. He then reasons that this does not amount to retroactive warrant practice because the magistrate would review probable cause not to justify the seizure itself, but to authorize subsequent tactical initiatives to take the armed suspect into full custody. *Id.* at 3186. Such analytical parsing makes little sense and is contrary to clearly established law. In fact, the dissent's reasoning is itself inconsistent. *See, e.g., id.* at 3184 (noting that once officers had time to thereafter secure a warrant the continuing seizure of Fisher necessitated the approval of a magistrate). This is not some kind of constitutional game. It is a recognition that the law permits police action in emergencies to protect us all when prior judicial approval is impractical and amounts to nothing more than second-guessing tactical decisions made in the heat of arrest.

Further, the dissent's proposed warrant application, when coupled with the erroneous notion that each entry into a residence constitutes a wholly distinct Fourth Amendment intrusion requiring either a warrant or independent exigent circumstances, as discussed *infra*, would perversely create a safe harbor period for armed suspects barricaded in their homes. Armed not only with weapons but also with the knowledge that, as long as they refrained from more openly hostile behavior, law enforcement could do nothing beyond containment without securing a warrant, suspects would reap a tactical advantage in standoff situations. Fisher, for instance, used his time during the incident to load and strategically place weapons around his home to frustrate anticipated forcible entry by officers.

passing moment whether the exigency justifying the warrant-
less arrest that existed at the start of the standoff had suffi-
ciently dissipated such that they must immediately divert one
or more officers from the task of resolving the standoff to the
time-consuming project of obtaining a warrant. As we have
recognized, "[o]btaining a telephonic warrant is not a simple
procedure; among other things, a duplicate original warrant
must be prepared in writing and read to the magistrate verba-
tim. The only step that is saved is the trip to the magistrate's
office." *United States v. Good*, 780 F.2d 773, 775 (9th Cir.
1986) (internal quotation marks and brackets omitted).

   The imposition of such an amorphous dissipation element
would also needlessly restrict law enforcement's ability to
quickly and effectively adjust tactics based on the evolving
events on the scene, placing lives in danger. Officers would
second-guess themselves, particularly because the ultimate
decision whether the exigency had sufficiently dissipated—
and, in turn, whether the warrant requirement had resurrected
—would be made months if not years later by a jury or a
judge from the confines of a courtroom, far removed from the
stresses of the armed standoff. We are hard pressed to see any
public benefit should overly cautious officers pass up a clear
opportunity to peacefully resolve a dangerous situation that
might present itself in the midst of a pending, but not yet
approved, warrant request. Nor do we see the logic in condon-
ing a scheme that exposes police to civil liability when, as
here, they elect to methodically respond to dangerous stand-
offs, but affords officers greater protection from liability if
they hastily force entry with guns blazing. Placing immediacy
at odds with prudence and discretion benefits no one.

   Finally, to rule in Fisher's favor would reward his recalci-
trance. We reject the notion that trained officers, who put
themselves in harm's way when handling a dangerous armed
standoff, essentially increase the constitutional rights of sus-
pects who, by their actions, both provoke and prolong the
need for continuing police action. To adopt his novel Fourth

Amendment theory encourages other suspects to barricade themselves in their residences, fortify their positions, and resist full arrest as the mere passage of time would serve as fodder for a suppression motion at the ensuing criminal trial or, as here, for a civil rights action seeking money damages from the police. The direct and foreseeable consequence will be prolonged standoffs, better equipped assailants, and heightened risk to all involved. The suggestion that imposing a warrant requirement on police already engaged in an armed standoff will diminish the risk to public safety, *see, e.g.*, Reinhardt Dissent at 3186-87, defies common sense.

[6] In sum, we adhere to the established principle that once there is a lawful warrantless seizure of a suspect based on probable cause and exigent circumstances, no constitutionally mandated role remains for the magistrate judge. A court can certainly later examine the officers' actions in connection with challenges to the basis for probable cause, and discharge the defendant from criminal prosecution if evidence is lacking. A civil rights suit may be pursued for using excessive force. But suggesting that a magistrate judge should be telling police in the middle of the standoff that they must withdraw or what tactics are permissible does not strike us as a reasonable role for a judicial officer under the Fourth Amendment.

b

Judge Reinhardt, in dissent, speculates that the creation of a mid-standoff warrant requirement would "help[ ] ensure that high-stakes standoffs occur only when legally proper" because a mid-event review by a magistrate might allow a standoff to terminate peacefully before police escalate their efforts. *Id.* at 3187. Such optimism is unfounded and, in any event, alien to the Fourth Amendment. Fisher's armed standoff, like all armed standoffs, did not miraculously arise. Rather, the incident at issue was a product of his own creation and persisted at his sole discretion. It is undisputed that Fisher's criminal acts and his unwillingness to surrender, com-

bined with his bizarre and dangerous conduct, triggered the armed besiegement. As the jury properly concluded on the evidence introduced at trial, his warrantless seizure was lawfully based on probable cause and exigent circumstances. His actions throughout were anything but peaceful.

The dissent does not recognize that we are dealing with an unrestrained, armed suspect who poses a continuing public safety risk—not a compliant arrestee or innocent homeowner.[8] We are respectful of the sanctity of one's home but disagree with the notion that police are *constitutionally* required to withdraw from an active armed standoff, leaving neighbors to deal with an unstable and well-armed suspect. After all, police are sworn to resolve dangerous situations by restoring the peace. *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006) ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties."). Furthermore, threatening to shoot police officers constitutes separate criminal behavior that establishes probable cause for arrest independent of the initial offense. Under these circumstances, due to the suspect's dangerous actions in resistance to arrest, the constitutional balance must be resolved by approving police efforts to neutralize the substantial threat

---

[8]In arguing for an expansion of the magistrate judge's role, the dissent discards the undisputed facts of this case and instead cites to a "conceivable" situation where officers learn that "the person in a residence is not the person who committed the offense in question and is not armed or dangerous." Reinhardt Dissent at 3187. This hypothetical has nothing to do with this disposition and is, at any rate, a complete *non sequitur*. If probable cause is lacking, an arrest cannot occur and a previously seized suspect must be released. *See United States v. Ortiz-Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005). If peace officers overstep their authority and violate a suspect's rights, the law holds them accountable. The mere potential for a theoretical scenario, especially one that bears no resemblance to the actual circumstances of the case before us, combined with the dissent's skepticism regarding officers' willingness to follow the law, hardly justifies rewriting the Constitution and creating an unprecedented warrant requirement.

arising from the armed standoff. The Fourth Amendment does
not grant amnesty. But the dissent's theory would.

Judge Reinhardt decries interferences with Fisher's Fourth
Amendment rights when police "hurled a throw phone, a
flash-bang device, and tear gas onto [his] property, forced him
from his home, [and] shot him with 'less-than-lethal' rubber
bullets." Reinhardt Dissent at 3173. He argues that, in armed
standoff situations, a magistrate judge would provide an inde-
pendent evaluation of the justifications for escalating and
increasingly invasive Fourth Amendment intrusions. This
position, which condones the continued warrantless seizure of
Fisher but not the methods used to detach him from his heav-
ily armed lair, comes close to suggesting the magistrate judge
should review tactics police employ to effectuate full arrest.
We are aware of no authority establishing the need to approve
or pre-authorize tactical decisions made by police during an
armed standoff, whether or not residential. This radical view
espouses the need for an entirely new warrant application and
a substantial expansion of a magistrate's role in Fourth
Amendment jurisprudence to assume tactical responsibility
for what force may be employed to dislodge Fisher. No case
has ever gone so far. The task of managing armed standoffs
is best left to those trained to handle them. Indeed, the Consti-
tution does not envision judges assuming the role of incident
commander in determining how best to resolve a standoff.

Simply put, imposing an ongoing warrant requirement upon
officers engaged in an armed standoff creates an unprece-
dented hurdle to apprehending armed suspects and resolving
an existing dangerous situation. It would not serve the public
good, as the dissent reasons. Rather, it would impede swift
resolution of dangerous circumstances by erecting an unrea-
sonable legal obstacle of questionable value that only encour-
ages the kind of judicial second-guessing the Supreme Court
has repeatedly condemned. "Reasonableness" remains the
touchstone under the Fourth Amendment. *Pennsylvania v.
Mimms*, 434 U.S. 106, 108-09 (1977). As the Court tren-

chantly observed in *Graham v. Connor*, 490 U.S. 386 (1989), "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397-98; *accord Saucier v. Katz*, 533 U.S. 194, 204-05 (2001); *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998).

C

We turn to the dissent's contention that the warrant requirement was resurrected at approximately 7 a.m. when the first responding officers returned to the station house after the MERGE team arrived to relieve them, and that each attempt thereafter to dislodge Fisher from his fortification was a distinct intrusion upon Fisher's Fourth Amendment rights. Reinhardt Dissent at 3175; *accord* Paez Dissent at 3168 n.1. This argument, which departs significantly from Fisher's dissipation theory, fails at its inception. The presence of exigent circumstances at the time of the warrantless seizure is undisputed in this case. The subsequent passage of time, which includes consideration of what officers might have done thereafter, is legally irrelevant with respect to the warrant requirement. *See United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985) (noting that exigent circumstances are viewed from the totality of the circumstances known to officers at the time of the warrantless action).

Fundamental to the dissent's theory is the flawed presumption that each entry constitutes a legally distinct Fourth Amendment intrusion that required either a warrant or independent exigent circumstances at the moment such entry occurs. Reinhardt Dissent at 3176. While the police concede that sometime after returning to the station house officers could have obtained a warrant to arrest the already-seized Fisher, it does not follow that police were therefore constitutionally required to do so. The Supreme Court has never intimated such a rigid rule; nor have we. *See United States v.*

*Turvin*, 517 F.3d 1097, 1103 (9th Cir. 2008) ("The Supreme Court has 'consistently eschewed bright-line rules [in the Fourth Amendment context], instead emphasizing the fact-specific nature of the reasonableness inquiry.' " (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996))).

We agree that the home is perhaps the most sacrosanct domain, where one's Fourth Amendment interests are at their zenith. *See LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000). But that general principle does not legitimize the dissent's extreme position that each and every entry by police into a suspect's home, in whatever form and regardless of the surrounding circumstances, amounts to "a violation of the sanctity and privacy of a suspect's home [and therefore] intrudes separately upon the suspect's Fourth Amendment rights." Reinhardt Dissent at 3176. The law is quite clearly otherwise. *See, e.g., Echegoyen*, 799 F.2d at 1280. The Fourth Amendment, by its very language, protects "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures." U.S. Const. amend. IV. It does not, however, protect a person's right to purposefully use his residence as a safe house for ongoing criminal conduct or as an impediment to lawful police action. A suspect, for instance, cannot defeat a lawful warrantless arrest with police in hot pursuit by seeking sanctuary in his home. *See, e.g., United States v. Santana*, 427 U.S. 38, 43 (1976). Similarly, Fisher cannot undermine his lawful warrantless arrest—nor can he increase his constitutional protections—by hiding within the four walls of his residence, readying his arsenal as a means to resist officers' reasonable efforts to take him into full physical custody.

*Tyler* and *Echegoyen* are controlling here. Judge Reinhardt's attempt to confine the application of this precedent to public safety concerns arising from fire hazards is neither persuasive nor sensible. *See* Reinhardt Dissent at 3181 ("Because *Echegoyen*, like *Tyler*, involved an entry responding to the public safety risks created by a fire hazard, that case, like

*Tyler*, is entirely irrelevant here."). We see no material difference between the substantial public dangers posed by the exigent situations—for example, an explosive fire hazard of a chemical substance used to process drugs, on the one hand, and an intoxicated and unpredictable gunman barricaded in a multi-unit apartment complex, on the other. Such a distinction makes little sense in the Fourth Amendment context. Indeed, the exigency arising from Fisher's death threats and weapons arsenal seems considerably more potent than a mere fire hazard.

Notwithstanding the dissent's misreading, these cases conclusively demonstrate that once exigent circumstances were established to justify warrantless action, the passage of time as Fisher obstinately rebuffed officers' efforts to effectuate his full arrest did not rejuvenate the warrant requirement. There was arguably time and personnel available in the cited cases to seek a warrant. But, as here, none was required. The common thread through *Tyler*, *Echegoyen*, and Fisher's case is that the warrant requirement remains excused at least as long as the purpose for the original action persists and so long as the subsequent actions continue toward that purpose. This is unequivocally clear in *Tyler* where the Court held that entry onto the premises the following day to continue the initial warrantless search and seizure was permissible, but that subsequent re-entries occurring several days later were "clearly detached from the initial exigency and warrantless entry" and thus required a warrant. 436 U.S. at 503, 511. Similarly, in *Echegoyen*, because they were designed to investigate and eliminate the potentially explosive fire hazard, the subsequent entries into the residence by police and narcotics detectives were permissible as a valid continuation of the initial warrantless entry. 799 F.3d at 1280.

The Court's analysis in *Tyler* and ours in *Echegoyen* focused on the nexus between the challenged entries and the original exigency that prompted the warrantless action—not on whether, in hindsight, officers had sufficient time to obtain

a warrant in the interim before the subsequent warrantless entries occurred. *See also Bing*, 456 F.3d at 565 ("The passage of time did not terminate the exigency because the ticking of the clock did nothing to cut off Bing's access to his gun, or cure him of his willingness to fire it . . . ."). The dissent's proposed view is simply not the law; nor should it be.[9]

It would strain credulity to contend that the MERGE team's actions after 7 a.m. were "clearly detached" from the danger Fisher posed or his warrantless seizure. This armed standoff was a single, ongoing event, and, as discussed *supra*, Fisher at all times remained armed and dangerous. A temporarily quiescent Fisher, fueled by alcohol and behaving irrationally, could have turned violent in the blink of an eye to make good on his death threats. That he did not is fortuitous but unavailing. *See Lindsey*, 877 F.2d at 781-82 (rejecting the evaluation of exigent circumstances in light of facts known only after officers' warrantless action). The law recognizes that officers on the scene cannot predict future events with the clarity with which we, as judges, can review the past.

The dissent claims that our opinion purports to "immunize" police action from constitutional scrutiny and strip Fisher and similarly situated suspects of their Fourth Amendment rights.

---

[9]The dissent's sole focus on whether police had time to obtain a warrant after Fisher was seized in his home is erroneous. Reinhardt Dissent at 3184; *see also id.* at 3179 (noting that the *only* reason for warrantless police action was insufficient time). It is undisputed that the need for immediate police action was prompted by an obviously intoxicated, unstable, and heavily armed Fisher who, through his words and his actions, was threatening to shoot people. The immense public safety risk, which never dissipated, coupled with insufficient time to obtain a warrant, initially justified Fisher's warrantless seizure in his apartment. The purpose of the police action remained constant, *cf. Mincey v. Arizona*, 437 U.S. 385, 394-95 (1978), and there was no intervening event that terminated the seizure. Under the authority of California Penal Code section 836(a), and bolstered by the principles of common sense applied by the jury, the police were thereafter authorized to complete that action and to neutralize the ongoing threat posed by Fisher.

*See, e.g.,* Reinhardt Dissent at 3176, 3178. We do no such thing. Nor does our holding presume that officers engaged in a standoff always reach the proper conclusion as to the legality of their actions. *See id.* at 3185. Nothing in today's opinion, for example, even hints at disturbing the Fourth Amendment requirement that the force, deadly or not, used in the course of arrest, investigatory stop, or other "seizure" of a person must satisfy the "objective reasonableness" standard. *Graham,* 490 U.S. at 396-97. To be clear, we do not suggest that the initial exigency and seizure thereafter condoned unfettered force to resolve the armed standoff, discharged all of Fisher's Fourth Amendment protections, or reduced in any way the probable cause needed to arrest. A court can certainly later examine the officers' actions in connection with a suspect's subsequent criminal trial or a collateral civil rights suit for other alleged Fourth Amendment violations, as the jury did here.

Our holding fits squarely within existing Fourth Amendment jurisprudence and respects the jury's determination. We simply refuse to take the momentous constitutional leap proposed by Fisher and advocated by the dissent.[10] As reasonableness is still the touchstone of Fourth Amendment analysis, an objective look at the totality of the circumstances supports the jury's conclusion that police acted properly without need to secure a warrant. *See Brigham City,* 547 U.S. at 404 ("An action is 'reasonable' under the Fourth Amendment . . . as long as the circumstances, viewed *objectively,* justify the action." (internal quotation marks and brackets omitted)). It is the need for taking immediate action in the face of rapidly evolving circumstances that the Supreme Court dictates

---

[10]"The states are, of course, free to limit warrantless arrests, as is Congress . . . ." *Santana,* 427 U.S. at 44 (White, J. concurring). As a constitutional matter, however, we refrain from imposing the dissent's proposed "nationwide edict, founded as it is on a belief in the superior wisdom of the Members of this Court and their power to divine that the country's practice to this date with respect to arrests is unreasonable within the meaning of the Fourth Amendment." *Id.*

must guide our reasonableness analysis under the Fourth
Amendment.

[7] In sum, the thrust of Judge Reinhardt's disapproval
largely relates to what he considers increasingly intrusive
police action employed by the MERGE team. Fisher had
ample opportunity to present his Fourth Amendment exces-
sive force claim and challenge the reasonableness of the tac-
tics employed as part of this § 1983 action. The jury,
however, rejected this claim and returned a verdict in favor of
the police. That judgment is not on appeal. The narrow issue
here is whether the mere passage of time resuscitates the for-
mality of a warrant requirement during a continuing armed
standoff situation when a warrant was initially excused by
exigent circumstances. We hold it does not.

IV

[8] Applying this rule here, we have no trouble concluding
that the evidence adduced at trial is legally sufficient to sup-
port the jury's verdict. Fisher precipitated an armed standoff
with the police by pointing a gun at them and threatening to
shoot. This behavior established exigent circumstances, which
excused the need for a warrant, and gave police probable
cause to arrest Fisher for several crimes. The fact that Fisher
was not seen with a gun after 6:30 a.m. is immaterial. He
remained at all times drunk, heavily armed, unpredictable,
and dangerous. The standoff continued uninterrupted for over
twelve hours while the police made successive attempts to
resolve it. Under the rule we have announced today, once
police had probable cause to arrest Fisher, and exigent cir-
cumstances excused the need for a warrant, they were not
required to ponder whether the exigency continued as the
armed standoff progressed. The police were justified in effec-
tuating the arrest of Fisher, notwithstanding the mere passage
of time.

[9] In light of the jury's verdict and our legal determination
that no warrant was required, the plaintiffs were not entitled

to judgment against the City under the *Monell* standard, which governs when a municipality can be held liable under 42 U.S.C. § 1983. *See Brass v. County of Los Angeles*, 328 F.3d 1192, 1198 (9th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). In short, there is no evidence that the City had a policy, written or implicit, that was the "moving force" behind any alleged constitutional violation. *Galen v. County of Los Angeles*, 477 F.3d 652, 667-68 (9th Cir. 2007). We reverse the district court's decision to grant Fisher's Rule 50(b) motion. Fisher is not entitled to the nominal damages awarded to him by the district court, nor is the San Jose Police Department required to train its officers in the manner ordered by the trial court. The jury's defense verdict is reinstated, and the district court shall enter judgment in conformance to it on remand.

REVERSED and REMANDED.

PAEZ, Circuit Judge, with whom PREGERSON, REINHARDT, and THOMAS, Circuit Judges, join, dissenting:

I can not agree with the majority's conclusion that substantial evidence supports the jury's verdict that Steven Fisher's Fourth Amendment rights were not violated when San Jose City police officers arrested him without a warrant at his home on October 24, 1999. The majority holds that Fisher's armed threats justified his warrantless arrest. The majority's analysis, however, is neither consistent with case law defining exigent circumstances, nor supported by the evidence, and effectively eliminates the need for law enforcement officers to obtain an arrest warrant when confronted with an armed standoff at a person's home.

To justify a warrantless seizure on the basis of exigent circumstances, the government must establish the factual basis for the exigencies *and* that there was no time to obtain a war-

rant before taking action to alleviate the exigencies. *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986). In reversing the district court's Rule 50(b) judgment, the majority disregards the latter requirement. Here, although the City presented substantial evidence that the officers reasonably believed that Fisher posed a threat to them and others, it presented no evidence to show that the officers did not have time to obtain a warrant before seizing Fisher while he was inside his apartment. Because the City failed to make such a showing, I agree with the district court that there was insufficient evidence to support the jury's verdict on the issue of exigent circumstances. I would therefore affirm the district court's order granting Fisher's motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).

I.

The Fourth Amendment, in part, protects "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures . . ." U.S. Const. amend. IV. As the Supreme Court has firmly recognized, "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511 (1961). Applying this protection to a person's home, the Court in *Payton v. New York*, 445 U.S. 573, 576 (1980), held that the Fourth Amendment "prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Without a warrant, such a seizure is "presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984) (quoting *Payton v. New York*, 445 U.S. at 586). The need to secure a warrant, however, is not necessary when the police have probable cause to arrest and exigent circumstances exist. *Id.* Importantly, when the government attempts to justify a warrantless seizure of a person in his home, "the police bear a heavy burden . . . to demonstrate an *urgent* need that might" excuse the obligation to obtain a warrant. *Id.* at 749-50 (emphasis added).

In applying this exception to the warrant requirement, we have defined

> exigent circumstances as those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.

*United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc); *see also United States v. Brooks*, 367 F.3d 1128, 1133 n.5 (9th Cir. 2004) (same). "Exigent circumstances alone, however, are insufficient as the government must also show that a warrant could not have been obtained in time." *United States v. Good*, 780 F.2d at 775; *see also United States v. Lai*, 944 F.2d 1434, 1442 (9th Cir. 1991) ("Exigency necessarily implies insufficient time to obtain a warrant; therefore the Government must show that a warrant could not have been obtained in time."); *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987) (same); *United States v. Echegoyen*, 799 F.2d 1271, 1279 (9th Cir. 1986) (same); *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir. 1983) (holding that as part of showing that a warrantless entry was "imperative," the government must demonstrate "that a warrant could not have been obtained in time even by telephone under the procedure authorized by Fed. R. Crim. P. 41(c)(2).")." Our definition of exigent circumstances is not novel. Indeed, the Supreme Court has stressed that a warrantless entry into a home may be "legal when there is compelling need for official action *and* no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (emphasis added).

For purposes of the Fourth Amendment analysis in this case, it makes no difference that the officers did not enter Fisher's apartment to take physical custody of him. We have

long recognized that "it is the location of the arrested person, and not the arresting agents, that determines whether an arrest occurs within a home." *United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980), *aff'd on other grounds*, 457 U.S. 537 (1982); *see also United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985) (holding that because defendant "only emerged under circumstances of extreme coercion, the arrest occurred while he was still inside his trailer."). With these basic Fourth Amendment principles in mind, I turn to the merits of the City's appeal and explain why I can not agree with the majority.

## II

In the context of an armed standoff, the majority holds that as long as probable cause and exigent circumstances existed at the initial seizure the police are not required to assess whether the "exigency persisted throughout the standoff because the standoff was no more than an actual continuation of the initial seizure." Maj. Op. at 3151 (internal quotation marks omitted). Under this rule, any dissipation of the exigencies before the person can be taken into physical custody does not require the police to reassess the need for a warrant. Maj. Op. at 3152. Although I seriously question whether the majority's holding is supported by *Michigan v. Tyler* or *United States v. Echegoyen*, the cases on which the majority primarily relies, I would not, in light of the record, decide those issues here.[1] In my view, because the City presented no evidence explaining why the officers did not have time to obtain a warrant when they seized Fisher at about 6:30 a.m., exigent circumstances did not exist and the warrantless seizure of Fisher violated the Fourth Amendment.[2]

---

[1] Although I believe that the court need not reach the issue, I agree with Judge Reinhardt's compelling analysis and therefore join his dissent.

[2] The majority complains that the basis for my dissent is at odds "with Fisher's own theory on appeal, and is contradicted by overwhelming evidence" in the record. Maj. Op. at 3148-49 n.4. The thrust of Fisher's argu-

I begin by noting that, for purposes of the Fourth Amendment, a seizure occurs when police officers use such force or show of authority that "a reasonable person would have believed he was not free to leave." *United States v. Al-Azzawy*, 784 F.2d at 892 (quoting *Florida v. Roger*, 460 U.S.

ment, however, was that the police never explained why there was insufficient time to obtain a warrant before they seized him. I recognize that Fisher states that "exigent circumstances" existed before 6:30 a.m. However, I do not understand Fisher's argument to concede that during the early morning hours there was insufficient time to obtain a warrant before taking any action. The fact that Fisher posed a threat does not end the inquiry. The inquiry, as noted above, must also consider whether the circumstances required urgent action, such that a warrant could not have been obtained in time. On that score, my view of the case is entirely consistent with the district court's ruling and Fisher's argument.

As for when Fisher was effectively seized for Fourth Amendment purposes, the majority asserts that there was sufficient evidence in the record for the jury to conclude that, in light of Fisher's actions, he was seized sometime before 6:30 a.m. After outlining Fisher's own behavior in the early morning hours of October 24, the majority concludes that "[a] reasonable person would not believe that his freedom remained unimpaired after engaging in such aggressive conduct toward the police officers surrounding his apartment." Maj. Op. at 3149 n.4.

This analysis of the moment of seizure departs substantially from our Fourth Amendment jurisprudence. "A person is seized if 'taking into account all of the circumstances surrounding the encounter, the *police conduct* would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)) (emphasis added). Our inquiry does not, as the majority suggests, seek to ascertain a person's view of the effect that his own conduct has upon the police. Rather, our inquiry, an objective one, "is designed to assess the coercive effect of police conduct" on that person. *Michigan v. Chesternut*, 486 U.S. 567, 573 (U.S. 1988).

As I explain above, the conduct of the police in this case would not have led a reasonable person to believe that "he was not at liberty to ignore the police presence and go about his business" until the MERGE team arrived on the scene. *See Bostick*, 501 U.S. at 437. In my view, no reasonable juror could conclude otherwise.

491, 501-03 (1983)); *see also United States v. Johnson*, 626
F.2d at 756. Where the police attempt to justify a warrantless
seizure on the basis of exigent circumstances, "[t]he critical
time for determining whether any exigency exists is the
moment the officer makes the warrantless entry." *United
States v. Johnson*, 256 F.3d 895, 907 (9th Cir. 2001) (en
banc). Here, until the San Jose Police Department's Mobile
Emergency Response Group and Equipment ("MERGE")
team arrived, a reasonable person in Fisher's position would
not have believed that his freedom had been so restricted that
he was not free to leave his apartment. That is the moment,
in light of all the circumstances, at which we must determine
whether the urgency of the situation was such that the police
had no time to obtain a warrant.

Between the arrival of the first responder, Officer Ryan,
and the assembly of the MERGE team around 6:30 a.m.,
nothing significant about the officers' activities would have
led a reasonable person to believe that he was not free to leave
if he desired to do so. Officer Ryan's actions were limited to
coaxing Fisher out of his apartment and attempting to engage
him in a meaningful conversation. When this proved unsuc-
cessful, Ryan called a tactical negotiator, Officer Males, to
assist. She responded and arrived around 3:15 a.m. Her
attempts to speak with Fisher were also unsuccessful. Indeed,
Fisher informed Males that she could enter his apartment, but
he would shoot her if she did. Males, like Ryan, neither
ordered Fisher to exit his apartment, nor displayed a weapon;
her objective was to persuade Fisher to exit his apartment
peacefully so that the officers could speak with him about the
events earlier in the morning. Both Males and Ryan specifi-
cally testified that they never told Fisher he was under arrest
or was required to leave his home. Although other officers
were positioned around the apartment building, there is noth-
ing in the evidence that shows that Fisher was aware of their
presence, or that the other officers attempted to make their
presence known to Fisher.

The arrival of the MERGE team on the scene, however, changed the atmosphere outside Fisher's apartment. Ryan called for the MERGE team at about the same time that he called for the tactical negotiator. Sometime between 6:00 and 7:00 a.m., approximately seventeen MERGE officers assembled at the scene along with an armored rescue vehicle and a mobile command center. The MERGE officers, dressed in tactical gear and armed, did not take long to make their presence known to Fisher. The MERGE team set up a loud speaker system and fully secured the perimeter areas. The record clearly reflects that by at least 6:30 a.m., a reasonable person in Fisher's position would have understood that, with such show of force, he was not free to leave.

In determining whether Fisher's seizure was justified, we must consider whether exigent circumstances excused the need for a warrant. That inquiry, as noted above, requires consideration of both the facts of the exigency and whether there was sufficient time to secure a warrant. No evidence in the record suggests that, from the time Fisher threatened Officer Ryan until 6:30 a.m. when the MERGE team was in control, there was insufficient time to obtain a warrant before taking any official action to seize or arrest Fisher. Officer Ryan and Males did testify that they did not believe that a warrant was necessary, but that subjective testimony is irrelevant, because the Fourth Amendment inquiry is an objective one. *United States v. McConney*, 728 F.2d at 1199. The evidence did establish, however, that a district attorney was available twenty-four hours a day/seven days a week to assist the police in obtaining a warrant, telephonically[3] or in person. The record also shows that a magistrate was on call twenty-four hours a day/seven days a week. Significantly, there was no explanation why any attempt to obtain an arrest warrant

---

[3]Under California Penal Code section 817(c)(2), the police may apply for an arrest warrant using telephone and facsimile transmission equipment, or using telephone and electronic mail.

between 2:00 and 6:30 a.m. would have frustrated the officers' on-scene objectives.

I fully understand the majority's concern for the ability of police officers to have the freedom to make swift tactical decisions that, in the context of a highly dangerous and volatile armed standoff, could implicate the safety of officers and others. I also recognize that when police face an armed standoff, there may be a compelling need to use force to enter a person's home immediately to alleviate a highly dangerous situation. However, the officers' measured and deliberate responses to Fisher's verbal and physical threats—summoning and waiting for both the tactical negotiator and the MERGE team—demonstrate that there was ample time to have at least made a good faith attempt to obtain a warrant. A review of this evidence leads to the inescapable conclusion that between 2:00 a.m. and the initial seizure at 6:30 a.m., there was ample time for the officers to obtain an arrest warrant. The subsequent arrest of Fisher was unlawful because the initial warrantless seizure, unsupported by exigent circumstances, was unlawful. For this reason, I would affirm the district court's Rule 50(b) judgment as a matter of law.

Because I would resolve this case on the basis of the evidence and our settled law, I see no need to "clarify our jurisprudence relating to the Fourth Amendment's application to armed standoffs." Maj. Op. at 3140. In my view, the majority reaches out to decide unnecessarily that, in the context of an armed standoff, a Fourth Amendment seizure is a continuous event and that any dissipation of the exigencies is not a factor in the analysis. In so holding, the majority virtually eliminates the urgency requirement of the exigent circumstances exception and thereby undermines, rather than clarifies, our Fourth Amendment jurisprudence.

For all of the above reasons, I respectfully dissent.

REINHARDT, Circuit Judge, with whom KOZINSKI, Chief Judge, and PREGERSON, THOMAS, and PAEZ, Circuit Judges, join, dissenting:

It is a fundamental principle of our Fourth Amendment jurisprudence that warrantless in-home arrests are permissible only when necessitated by exigent circumstances. Even if exigent circumstances existed at 6:30 a.m. when the police initially constructively seized Fisher by surrounding his home,[1] the officers involved in the ensuing standoff violated the Fourth Amendment by failing to seek a warrant before escalating their initial interference with Fisher's Fourth Amendment rights. This escalation occurred when the police hurled a throw phone, a flash-bang device, and tear gas onto Fisher's property, forced him from his home, shot him with "less-than-lethal" rubber bullets, and ultimately made an actual forcible arrest some eight hours after the initial constructive seizure. The officers undisputedly had more than enough time and opportunity to procure a warrant before taking those additional invasive actions, and their failure to do so violated the Fourth Amendment. In reaching this determination, I reject the majority's unprecedented conclusion that, once a police action is initiated without a warrant because there is insufficient time to obtain the approval of a magistrate, that action may be substantially expanded and continued indefinitely without a warrant, even though the police have every opportunity to obtain one with respect to the additional Fourth Amendment intrusions.

## I.

Warrantless in-home searches and seizures are permissible only if the police demonstrate exigent circumstances. Such circumstances are not present "unless the government demon-

---

[1] I do not believe it necessary to decide for purposes of this dissent whether exigent circumstances existed when the police constructively seized Fisher by surrounding his home.

strates that a warrant could not have been obtained in time
. . . .," *United States v. Manfredi*, 722 F.2d 519, 522 (9th Cir.
1983); *see also Bailey v. Newland*, 263 F.3d 1022, 1033 (9th
Cir. 2001) (" '[T]he presence of exigent circumstances neces-
sarily implies that there is insufficient time to obtain a war-
rant; therefore, the government must show that a warrant
could not have been obtained in time.' ") (quoting *United
States v. Tarazon*, 989 F.2d 1045, 1049 (9th Cir. 1993);
*United States v. Lindsey*, 877 F.2d 777, 782 (9th Cir. 1989).
In other words, the absence of time to obtain a warrant is a
necessary condition for a finding of exigent circumstances; if
time to obtain a warrant is available, there are necessarily no
exigent circumstances.

Here, there is no dispute that the police could have obtained
a warrant during the period between their arrival at Fisher's
apartment and the forcible arrest that ended the standoff.
Although more than 60 officers participated in the standoff,
no officer sought a warrant at any point during the 12 hours
in which the incident transpired. Some of the officers who
first responded to the incident left the scene at 7 a.m. and
returned to the police station; these officers, for example,
could easily have prepared a warrant application and sought
a magistrate's approval, without adversely affecting the police
activities at the standoff in any way.

As the district court noted, "Defendants have offered no
explanation, and none exists, as to why [not] *one* of these offi-
cers was [ ]able to seek and obtain a telephone warrant or
make use of the procedures available twenty-four hours a day
to obtain a warrant from a judge in person . . . ." The standoff
here did not involve "rapidly unfold[ing]" events that pre-
vented the police from seeking a warrant. *Cf. United States v.
Sarkissian*, 841 F.2d 959, 964 (9th Cir. 1988). Likewise, in
light of the return to the station house of a number of officers
from the scene at 7 a.m., the defendants cannot assert that
their ability to procure a warrant was evident only in hind-
sight. *Cf. Lindsey*, 877 F.2d at 782 (finding that no warrant

was required where officers had the time to procure a warrant only because of an unforeseeable delay in the arrival of reinforcements). Rather than "taking *immediate* action in the face of rapidly evolving circumstances," Majority Opinion at 3163 (emphasis added), the defendants in this case chose a course of action that gave them more than sufficient time and opportunity to procure a warrant, and failed to obtain one only because they elected not to do so.[2] Their failure to obtain a warrant in these circumstances violated the Fourth Amendment and compels affirmance of the district court's decision.

Whether or not the initial constructive seizure was, as the majority claims, justified by exigent circumstances, those circumstances no longer existed after 7 a.m. when the officers returned to the station house with a full opportunity to procure a warrant. In the absence of such circumstances, the officers were required to seek a warrant before further accelerating their intrusion on Fisher's Fourth Amendment rights, and certainly before forcing him out of his home and making a forcible arrest.

In the context of in-home arrests, the warrant requirement protects two distinct Fourth Amendment rights. First, it protects a right to personal liberty by preventing unjustifiable detentions. Second, it protects the privacy and sanctity of the home. The home is "perhaps the most sacrosanct domain" — the domain in which "Fourth Amendment interests are at their strongest." *LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000). Due to the home's sanctity, "[t]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980). For the same reason, any warrantless entries that do occur "must be 'strictly circum-

---

[2]It appears from the record that it was approximately three and a half hours after the constructive seizure when the officers first escalated the Fourth Amendment intrusion.

scribed by the exigencies which justify [their] initiation.' "
*Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (quoting *Terry
v. Ohio*, 392 U.S. 1, 25-26 (1968).

The fact that Fisher was *constructively* seized by the police
at approximately 6:30 a.m. cannot justify the subsequent war-
rantless intrusions that occurred long after a warrant could
have been obtained. Because each subsequent intrusion
involves a violation of the sanctity and privacy of a suspect's
home, each intrudes separately upon the suspect's Fourth
Amendment rights. Because any warrantless entry of the
home must be strictly circumscribed by the exigent circum-
stances justifying it, police crossings of that "firm line at the
entrance to the house" established by the Fourth Amendment
must be supported by either a warrant authorizing the physical
entry or by exigent circumstances. Once a warrant is obtained
— ordinarily not a very difficult task when time exists — the
necessary support is provided, and no additional warrant is
needed to justify any subsequent intrusions. However, when
the exigency has ended, no additional intrusions are permissi-
ble without a warrant. Forcing a suspect out of his home and
physically arresting him through the use of force involves an
additional intrusion upon his personal liberty far more serious
than the surrounding of his home or apartment, and must
unquestionably be justified by a warrant or exigent circum-
stances. Because of the significant additional intrusions upon
Fisher's Fourth Amendment rights resulting from the subse-
quent actions of the police, his *constructive* seizure at approx-
imately 6:30 a.m. cannot immunize those subsequent actions
from constitutional scrutiny if there was time and opportunity
to obtain a warrant before they occurred. *Cf. Terry v. Ohio*,
392 U.S. 1, 17 (1968). Any contrary rule entirely disregards
the fundamental differences between a constructive seizure
and an actual, forcible arrest or home invasion.[3]

---

[3]In light of these substantial additional intrusions of Fisher's Fourth
Amendment rights, we need not determine in this case whether the simple
continuation of a constructive seizure also requires the procuring of a war-
rant after the police have the time and opportunity to obtain one.

Here, hours after the constructive seizure and long after they had an opportunity to obtain a warrant, the police engaged in a series of escalating intrusions into Fisher's apartment designed to force him out of his home, followed by a forcible physical arrest. They first broke a sliding glass door and threw a "throw phone" — a phone encased in a box that also contains a live microphone — onto Fisher's patio. Just before 11 a.m., they detonated a flash-bang device on Fisher's property in order to attempt to disorient him. At 1 p.m. — six and a half hours after the constructive seizure — the police officers threw into his apartment, through a door they had broken, four tear gas canisters. The officers next deployed another round of tear gas at 1:30 p.m. Fisher finally was forced out of his home around 2:35 p.m. and, in accordance with police instructions, walked in a designated direction with his hands in the air. When he stopped walking forward, the police responded by shooting him in the leg with a less-than-lethal bullet, and then physically placed him under arrest.

As the actions of the police who surrounded the house escalated, they became increasingly more dangerous to Fisher and more invasive of his rights. The initial action involved a *constructive* seizure and presented little risk of damage to his apartment or physical injury to him. The subsequent actions of the police involved the *actual* physical invasion of his property with a throw phone, a flashbang device, and tear gas, and the use of increasingly dangerous tactics, including the hurling of the flash-bang device onto the premises, *see, e.g., United States v. Ankeny*, 502 F.3d 829, 833 (9th Cir. 2007) (noting first- and second-degree burns caused by explosion of flash-bang device), followed by tear gas canisters, and finally the firing at him of less-than-lethal bullets, culminating in his physical injury and forcible physical arrest. Given the drastically different consequences of the initial constructive seizure and the subsequent police actions — consequences directly related to the suspect's interests in privacy, personal security, and the sanctity of the home, all of which are protected by the Fourth Amendment — and the requirement that any warrant-

less intrusion upon Fourth Amendment rights be strictly circumscribed by the exigent circumstances justifying the intrusion, the alleged legality of the initial warrantless constructive seizure did not render the subsequent warrantless actions of the police constitutional. Those further intrusions on Fisher's Fourth Amendment rights would have been lawful only if the police had obtained a warrant or if, at the time those further intrusions occurred, exigent circumstances continued to exist; as explained *supra*, such exigent circumstances would have existed at the time of the further intrusions only if *at that point* the police had not had an opportunity to obtain a warrant.

## II.

The majority contends that a warrant was not required for the Fourth Amendment intrusions that followed Fisher's constructive seizure in his home because the protections of the Fourth Amendment were stripped from him at the time his home was surrounded. Thus, the majority argues, the subsequent actions were "no more than an actual continuation of the initial seizure." Majority Opinion at 3150 (citation omitted). There is no legal authority whatsoever that supports this contention. The majority relies entirely on two wholly inapplicable cases: the Supreme Court's decision in *Michigan v. Tyler*, 436 U.S. 499 (1978), and this court's decision in *United States v. Echegoyen*, 799 F.2d 1271, 1273 (9th Cir. 1986). Neither *Tyler* nor *Echegoyen* supports the majority's holding, and majority offers no other support for its theory of the stripping of Fourth Amendment rights by an initial constructive seizure.

*Tyler* dealt with an entirely different question: the intrusion of firefighters onto private property in order to fight a fire and their right to remain on the premises for a reasonable period in order to (1) determine the fire's cause and (2) make certain that there is no danger that the fire will start up again. The Court held that firefighters do not need a warrant for such an

intrusion — i.e., that actual firefighting is categorically exempt from the warrant requirement. It also held that, when at 4 a.m. "darkness, steam and smoke" temporarily prevented fire officials from pursuing that objective, their departure from the premises and return "shortly after daylight" to complete their mission did not constitute a termination of one intrusion and the commencement of another, one for which a warrant might be required. 436 U.S. at 510-11. Instead, the Court held that when the search resumed the fire officials were still pursuing their initial action, one for which a warrant was not needed. *Id.*

The Court made plain in *Tyler* what would appear obvious. It stated, "It would defy reason" to assert that firefighters would need a warrant to enter a building to fight a fire, *id.* at 509, or to remain there "for a reasonable time" to determine the fire's cause and make certain that it would not resume, *id.* at 510. The fire itself, the Court explained, provides a sufficient excuse from the requirement that a warrant be obtained; it added that resuming the investigation in the morning was simply "an actual continuation" of the prior evening's categorically exempt activities.

Here, however, there is no question that a warrant *is* required for the type of action undertaken by the police, including the initial constructive seizure of Fisher in his home. In Fisher's case, the requirement that a warrant be obtained was excused only because there was insufficient time to obtain one before undertaking the initial police action. *Tyler* tells us nothing about whether, in such cases, when conditions change and there is time to seek a magistrate's authorization a warrant must be offered before the police engage in further and more substantial Fourth Amendment intrusions.

In short, *Tyler* is a case about a category of actions for which a warrant is not required, while *Fisher* is about a category of actions for which one is. That the firefighters' actions in *Tyler* all constituted a part of a continuing categorically

exempt investigation renders the case of no relevance here. To base approval of the warrantless actions of the police in Fisher's case on the Supreme Court's holding in *Tyler* is to misunderstand fundamentally the nature and purpose of the Fourth Amendment warrant provision.

Unlike the majority's interpretation, this reading of *Tyler* accords with the Supreme Court's subsequent treatment of the case. *Tyler* has been cited at least twice by the Court for its specific holding that fire investigators may remain on the premises where a continuing or recently extinguished fire has occurred, in order to determine the fire's cause. *See, e.g., Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).[4] The Supreme Court has *never* interpreted *Tyler*, however, as establishing a "mere continuation" exception to the warrant requirement in criminal cases or suggested that any such exception applies to in-home warrantless arrests. In fact, in the thirty years since *Tyler* was decided, the Court has never relied upon *Tyler*'s "mere continuation" holding to justify a search or seizure for law enforcement purposes.

*Echegoyen*, upon which the majority also relies, is inapplicable here for the same reason as *Tyler*. As the district court held, the subsequent entry in *Echegoyen* "was a [ ] limited entry done for the purpose of avoiding a possible explosion" at a time when the evidence showed the existence of an "explosive" and "potentially dangerous fire hazard." 799 F.2d at 1274, 1278. "[T]he subsequent entry . . . was based on the need to use [the officers'] expertise in inspecting the premises for a possible fire hazard." *Id.* at 1280; *see also id.* at 1278

---

[4]Another part of *Tyler* has been cited as a ruling on administrative searches. *See, e.g., Soldal v. Cook County, Ill.*, 506 U.S. 56, 67 (1992) (citing *Tyler* for the proposition that "the [Fourth] Amendment's protection applies in the civil context"); *Michigan v. Clifford*, 464 U.S. 287, 291 (1984) ("In *Tyler*, we restated the Court's position that administrative searches generally require warrants.").

("The second entry was . . . done to inspect the premises to determine if any public safety hazard [related to a fire or explosive hazard] remained."). Thus, the "subsequent" entry in *Echegoyen* was a *Tyler* entry designed to investigate and eliminate a potentially explosive fire hazard. Because *Echegoyen*, like *Tyler*, involved an entry responding to the public safety risks created by a fire hazard, that case, like *Tyler*, is entirely irrelevant here.[5]

Because *Tyler* involves an intrusion to suppress a fire and make certain that it would not resume — an intrusion for which no warrant is necessary — and *Echegoyen* involves a similar intrusion for the purpose of investigating a potential explosive fire hazard, neither case offers any support for the majority's decision. And without *Tyler* and *Echegoyen*, the majority is left with nothing, not a single case, that lends any support to its theory: that no warrant is required for any Fourth Amendment intrusion, regardless of its nature, that occurs at any time following the warrantless surrounding of a dwelling and constructive seizure of its occupant, even though the police have more than sufficient time to obtain a warrant before undertaking such actions.[6] The majority may

---

[5]*Tyler* and *Echegoyen* are inapplicable here for another reason. In both cases, the "continuation" was identical to the initial Fourth Amendment intrusion; no more, no less. In *Tyler*, the investigation that was interrupted by a lack of visibility was not expanded in any manner, nor was it more intrusive on Fourth Amendment rights, when it resumed at daybreak. Likewise, the two searches at issue in *Echegoyen* were identical with respect to the extent of the invasion of the interests protected by the Fourth Amendment. By contrast, the majority here holds that *any* police action for which there was insufficient time to obtain a warrant at the outset is thereafter *entirely* exempted from the Fourth Amendment's warrant requirement, no matter how much greater the subsequent intrusions.

[6]The majority's citations to *Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555 (6th Cir. 2006) also do not support its theory. I wholeheartedly agree with *Bing* that "[e]xigent circumstances terminate when the factors creating the exigency are negated." *Id.* at 565. One necessary "factor[ ] creating . . . exigency" is the inability to procure a warrant in a timely

wish the law were different, but we must apply it as it is, and
the law as of today limits warrantless intrusions into the home
for the purposes of a search or seizure to instances in which
exigent circumstances exist — that is, circumstances in which
the police do not have time to procure a warrant.

## III.

Because a police action may be commenced before a war-
rant can be obtained, it does not follow that the police may
continue that action indefinitely or may significantly escalate
their invasion of a suspect's Fourth Amendment rights with-
out obtaining a warrant, even though they have a full opportu-
nity to obtain one first. Specifically, where a house is
surrounded and its occupants constructively seized without a
warrant because of lack of time to obtain one, it does not fol-
low that a forceful invasion of the home or a forcible arrest
of the person may be initiated without a warrant long after
one could be obtained.[7] To the contrary, whenever the justifi-

---

fashion. Here, there is no dispute that that factor was "negated" before
fundamental intrusions upon Fisher's Fourth Amendment rights occurred
many hours after the constructive seizure. For the same reason, the majori-
ty's second citation to *Bing* is inapposite: Even if Fisher "was at all times
dangerous," *id.*, the second factor required to demonstrate exigency — the
inability to obtain a warrant in time — had dissipated before the subse-
quent entries and ultimate arrest, and thus the reason not to obtain a war-
rant no longer existed.

[7]Although the majority suggests that "we are dealing with an unre-
strained, armed suspect who poses a continuing public safety risk — not
a compliant arrestee or innocent homeowner," Majority Opinion at 3157,
it does not so limit its holding. Its rule — that an initial constructive sei-
zure based on exigent circumstances eliminates any further need for a war-
rant, no matter how much time elapses or how much more invasive the
subsequent police actions — could be applicable to all constructive sei-
zures justified by exigent circumstances, not just those involving armed
standoffs or individuals who pose a continuing public safety risk. In truth,
the majority suggests just the kind of "rigid" " 'bright-line' " rule that it,
itself, tells us is improper in the Fourth Amendment context. Majority
Opinion at 3159-60 (quoting *United States v. Turvin*, 517 F.3d 1097, 1103
(9th Cir. 2008)).

cation for a serious intrusion on Fourth Amendment rights may be presented to a neutral magistrate for his consideration, law enforcement officers are required to do so. That is the fundamental teaching of the Fourth Amendment, and nothing in the circumstances of this case justifies a departure from that simple rule, particularly as the obtaining of a warrant here would in no way have interfered with or delayed the ongoing police action. As pointed out earlier, any of the numerous officers who withdrew from the scene and returned to the station-house could have prepared the necessary application and presented it to a magistrate.

As Justice Jackson explained more than 60 years ago, the basic protection of the Fourth Amendment "consists in requiring that [the] inferences [justifying a search or seizure] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 13-14 (1947). A neutral evaluation protects Fourth Amendment rights by reducing the risk of unjustifiable searches and seizures and by requiring that police carefully define the reasons for and scope of any particular search or seizure. Because of the importance to Fourth Amendment interests of a magistrate's review of a warrant application, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify" a departure from the warrant requirement. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). Such departures are " 'few in number and carefully delineated.' " *Id.* at 749-50 (quoting *United States v. United States District Court*, 407 U.S. 297, 318 (1972)). It is only in those limited instances where necessity requires abatement of this principle that we do so — in other words, only in exigent circumstances.

Because exigency is an exception to a fundamental principle of the Fourth Amendment mandated by necessity, any warrantless search or seizure "must be 'strictly circumscribed by the exigencies which justify its initiation.' " *Mincey*, 437

U.S. at 393 (quoting *Terry*, 392 U.S. at 25-26).[8] Here, as in all cases involving exigent circumstances, there was at the outset insufficient time to obtain a warrant. When that condition of exigency dissipated — i.e., when there *was* time to obtain a warrant — the exigency itself no longer existed and there was no longer any justification for continuing or escalating the intrusion on Fisher's Fourth Amendment rights without allowing "a neutral and detached magistrate" to evaluate the circumstances.[9]

In suggesting that requiring a warrant in the circumstances of Fisher's case would serve no purpose, the majority fails to comprehend the significance of its abandonment of basic Fourth Amendment principles. According to the majority, "any warrant obtained by the police would have merely authorized them to do exactly what they were already doing, and indeed, exactly what they were already authorized to do: surround Fisher's home and attempt to neutralize the threat that he posed by arresting him. We do not see what a neutral

[8]In addition to relying upon *Tyler* and *Echegoyen* in a way that the Supreme Court itself has never done, the majority departs from the Court's prior authority by entirely ignoring *Mincey*'s requirement that warrantless searches and seizures be "strictly circumscribed." This is not surprising, because the majority's approach is utterly irreconcilable with that requirement.

[9]The majority asserts that my "focus on whether police had time to obtain a warrant . . . is erroneous." Majority Opinion at 3162 n.9. However, it is the majority's understanding of exigent circumstances that is faulty. *Newland*, *Lindsey*, and *Manfredi* establish that exigent circumstances *do not exist* unless there is inadequate time to obtain a warrant. Of course, the absence of time alone is not sufficient for a finding of exigent circumstances. The situation must *also* involve " 'a substantial risk of harm to the persons involved or to the law enforcement process . . . .' " *United States v. Gooch*, 6 F.3d 673, 679 (9th Cir. 1993) (quoting *United States v. Al-Azzawy*, 784 F.2d 890, 894 (9th Cir. 1985)). Exigent circumstances exist only where *both* of the conditions are met. Because the police had time to obtain a warrant, one of the two requisite conditions was not met, and the general constitutional rule requiring the obtaining of a warrant applied.

and detached magistrate would have added in helping to peacefully effect Fisher's arrest." Majority Opinion at 3153 (footnote omitted). This analysis is startling. As Justice Jackson explained, the purpose of the warrant requirement is *not*, as the majority appears to believe, to help police "effect [a suspect's] arrest," *id.*, but to ensure that the decision to arrest an individual is consistent with the Constitution. Nothing in the circumstances of Fisher's constructive seizure eliminates the value of a neutral, detached evaluation of the reasons for the subsequent invasions of his home, including his forcible extraction from it in order to physically arrest him. In such circumstances the magistrate does not "pre-authorize tactical decisions made by police," Majority Opinion at 3158, as the majority suggests, but instead, as in any other case, the magistrate provides an independent evaluation of the justifications for the Fourth Amendment intrusions that have not yet occurred — in this case escalating intrusions of a different order than a simple constructive seizure.[10] By suggesting that requiring a warrant here would be pointless the majority presumes that officers engaged in a standoff always reach the proper conclusion as to the legality of a search or seizure; however, the Fourth Amendment provides that, whenever

---

[10]The majority suggests that this approach would require magistrate judges to evaluate the tactics used by police during a standoff. That is simply incorrect. The majority confuses a reason we must require a warrant after exigent circumstances have dissipated — namely, that police actions subsequent to the constructive in-home seizure of a suspect involve additional, greater intrusions upon the suspect's Fourth Amendment rights — with the role played by the magistrate judge hearing the warrant request. The magistrate judge would treat a warrant application in these circumstances no differently from any other warrant application: He would simply ask whether the requested warrant meets the requirements of the Fourth Amendment, including probable cause, specificity, and support by oath or affirmation. U.S. Const. amend. IV. If a warrant for the suspect's arrest is obtained, no additional resort to the magistrate is necessary, regardless of the subsequent tactics chosen by the police. The majority's bogeyman — a magistrate judge at the scene of a standoff evaluating each and every tactical decision — is wholly illusory and bears no relationship to judicial reality.

possible, the determination of the validity of a prospective
search or seizure may not be made by the police alone.

Furthermore, requiring a warrant in these circumstances
would not involve a "retroactive warrant practice." Majority
Opinion at 3153. The warrant would not, as the majority
seems to believe, justify the prior constructive seizure of the
suspect. Instead, it would authorize the additional intrusions
upon the suspect's Fourth Amendment rights that may result
from the subsequent actions of the police. Even if a construc-
tive seizure effectively places the suspect under arrest, as the
majority claims, *but cf. California v. Hodari D.*, 499 U.S.
621, 626 (1991) ("An arrest requires *either* physical force . . .
*or*, where that is absent, *submission* to the assertion of author-
ity.") (emphasis in original), the purpose of the arrest is not
fulfilled until the suspect has actually submitted to the author-
ity of the police. Thus, the police are actively engaged in exe-
cuting the arrest for as long as the suspect does not submit.
Where, as here, the constructive seizure continues for a sub-
stantial period of time and the efforts of the police to effect
the suspect's submission involve additional serious intrusions
upon his Fourth Amendment rights, those intrusions must be
supported either by a warrant or by exigent circumstances.

The neutral judicial evaluation provided by a magistrate
judge's review of a warrant application is especially important
in cases involving nighttime in-home arrests, often after forc-
ible entries, and lengthy standoffs, which are inherently dan-
gerous and may lead to tragic consequences. Such
occurrences can lead to the death of the suspect or the
destruction of the suspect's home, *see, e.g., Bing*, 456 F.3d at
558, 562 (suspect killed during raid and home burned down
by fire started by flashbang device); or to the death of inno-
cent third parties, *see, e.g., Ewolski v. Brunswick*, 287 F.3d
492, 499 (6th Cir. 2002) (suspect killed his son during stand-
off). An infamous police standoff in Philadelphia resulted in
the deaths of eleven people, including five children, and the
destruction of an entire city block. Don Terry, *Philadelphia*

*Held Liable for Firebomb Fatal to 11*, N.Y. Times, June 25, 1996, at A10. Even where no deaths result from a standoff, the consequences may nonetheless be tragic. *See, e.g.*, *O'Brien v. Grand Rapids*, 23 F.3d 990, 994 (6th Cir. 1994) (suspect rendered quadriplegic during raid). Closer to home, this Circuit has seen its own share of tragic police standoffs, from the shootout at Ruby Ridge, *see Harris v. Roderick*, 126 F.3d 1189, 1193-94 (9th Cir. 1997) (describing the deaths of the wife and son of the subject named in the arrest warrant the enforcement of which led to the Ruby Ridge incident), to the destructive fire that ended the 1974 standoff between the Los Angeles Police Department and members of the Symbionese Liberation Army. Requiring that, when there is time to do so, police procure a warrant in such circumstances helps ensure that high-stakes standoffs occur only when legally proper.

Furthermore, in any standoff it is entirely conceivable that, following its commencement, information may be developed that establishes that the person in a residence is not the person who committed the offense in question and is not armed or dangerous. If the magistrate judge hearing a warrant request prepared after an initial constructive seizure determines that a physical arrest would be impermissible, either because the police do not have probable cause to believe that they have the right person or because they otherwise lack probable cause to make an arrest, then the standoff can be terminated peacefully *before* the escalating efforts to extract the suspect from his home increase the likelihood of a tragic end to the confrontation. Procuring a warrant in such circumstances is anything but an "empty gesture," as the majority suggests. Majority Opinion at 3154.

The primary question, however, is not the presence of probable cause; it is who should make the determination required by the Constitution. Asking a magistrate judge to determine whether an arrest is supported by probable cause is not simply a "reasonable role for a judicial officer," *id.*; it is constitutionally required, absent exigent circumstances, and is especially

important in the high stakes context of nighttime in-home arrests or potential armed standoffs. The Fourth Amendment requires that, before certain invasions of constitutional interests may transpire, a neutral magistrate must determine whether probable cause exists. Whether a warrant is issued by the magistrate or not, submitting the application to him for his review fulfills the dictates and purpose of the Constitution and helps safeguard the rights of all individuals. The Constitution requires a warrant unless exigent circumstances exist at the time of the Fourth Amendment intrusion in question. Exigency requires a lack of time, and any exigency here no longer existed when the police engaged in the substantial Fourth Amendment intrusions that occurred hours after the initial constructive seizure of Fisher. The majority provides no support for its departure from the Constitution's requirements.

## IV.

Finally, the majority justifies its decision on the ground that requiring a warrant in these circumstances would interfere with the efficiency and efficacy of police operations. However, "the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Mincey*, 437 U.S. at 393. The majority's concerns for police efficiency are commendable, but they are extra-constitutional and exceed the proper role of the judiciary — absent exigent circumstances, the Fourth Amendment requires a warrant regardless of the majority's view that the Fourth Amendment may be inefficient.

The majority's efficiency concerns are also chimerical. Requiring officers with the time and ability to procure a warrant to follow the dictates of the Constitution would not "divert one or more officers from the task of resolving the standoff," Majority Opinion at 3155, nor would it lead police to "ponder with each passing moment whether the exigency . . . that existed at the start of the standoff had sufficiently dis-

sipated such that they must immediately" obtain a warrant. *Id.*
No diversion of officers is necessary and no pondering by
officers is required. If the officers do not have the time or
ability to procure a warrant, the exigency continues. The offi-
cers' first priority is to perform the duties in which they are
engaged. If all of the officers at a standoff are engaged in
responding to the "rapidly unfold[ing]" events, there is no
time for them to procure a warrant and, accordingly, no need
for them to do so. *Sarkissian*, 841 F.2d at 964. The police here
chose a course of action that afforded a number of the officers
all the time necessary to procure a warrant. Numerous officers
left the scene during the twelve hour period at issue and those
officers had a more than sufficient opportunity to seek a war-
rant. All chose not to do so, despite the clear requirements of
the Fourth Amendment.

Moreover, rather than inviting judicial review "months if
not years later by a jury or a judge from the confines of a
courtroom" or placing judges in "the role of incident com-
mander," requiring a warrant in such circumstances will
*decrease* the possibility of judicial "second-guessing." Major-
ity Opinion at 3155, 3158. Obtaining a warrant will afford the
police protection against a number of potential lawsuits. Simi-
larly, should a magistrate decide that the issuance of a warrant
is not justified, the police will likely avoid a serious constitu-
tional error and subsequent unfavorable judicial review years
later; in addition, they may even discover that they are wrong
as to the merits of the case. At the very least, requiring the
police to procure a warrant ensures that they will do a proper
job in obtaining the evidence necessary to establish that they
have the right person. Under the majority's rule, however, an
initial constructive seizure of an individual that occurs before
there is an opportunity to obtain a warrant will relieve the par-
ties of the ordinary obligation to obtain the objective view of
a magistrate judge before engaging in major armed actions,
thereby jeopardizing the public safety and opening the police
to liability against which they might otherwise be protected.

Finally, the majority's concern that requiring a warrant would create a "safe harbor" for suspects in active standoffs, Majority Opinion at 3154 n.7, is entirely baseless and reflects its failure to comprehend the relationship between the exigent circumstances exception and the fundamental Fourth Amendment warrant requirement. Should "a clear opportunity to peacefully resolve a dangerous situation" arise "in the midst of a pending, but not yet approved, warrant request," Majority Opinion at 3155, or should the suspect's actions demonstrate the need for an immediate police response while a warrant request is pending, the police officers are free to act without a warrant because they would not have had time to obtain one before acting. This would seem to be a fairly elementary proposition, but one that the majority fails to comprehend. In sum, once again, the crisis the majority fears is wholly nonexistent.

\* \* \*

The majority's contention that requiring a warrant in the circumstances presented by this case would be pointless and inefficient suggests that today's opinion has less to do with the conduct of Fisher — whose drunken interaction with a security guard led to a twelve-hour, hostage-free standoff; a single misdemeanor conviction; and an award of nominal damages and additional police training — and more to do with the majority's lack of respect for the warrant requirement. This court is not free to abandon that requirement, and it is regrettable that the majority renders it a nullity in the category of cases before us. It does so without any precedent in law, and its sole legal rationale consists of an erroneous extension of a single Supreme Court case — a case designed to allow emergency efforts by firefighters to eliminate unsafe fire conditions — to circumstances in which it has absolutely no applicability. Even more regrettable is the majority's failure to respect the historic Fourth Amendment principles that give meaning to the warrant requirement. Accordingly, I dissent.